*Paul*

CONTRACT MINING AGREEMENT

BETWEEN

SIDNEY COAL COMPANY, INC.

AND

"NEW ERA" COAL CO., INC.

DATED _____6/10_____, 1988.

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Employment of Independent Contractor | 2 |
| 3. | Nonexclusive Right to Mine; Direction of Owner | 4 |
| 4. | Prior Investigation By Contractor | 5 |
| 5. | Conformity With Laws | 6 |
| 6. | Term of Agreement | 6 |
| 7. | Payments | 7 |
| 8. | Force Majeure and Right to Refuse Delivery | 8 |
| 9. | Time of Payments | 9 |
| 10. | Scales | 9 |
| 11. | Books of Account; Right to Audit | 9 |
| 12. | Repairs and Premises | 10 |
| 13. | Alteration of Premises | 10 |
| 14. | Fines and Penalties | 10 |
| 15. | Owner Payments | 11 |
| 16. | Taxes and Assessments | 11 |
| 17. | Workers' Compensation | 12 |
| 18. | Engineering and Special Services | 13 |
| 19. | Depletion | 13 |
| 20. | Use of Owner's Equipment | 13 |
| 21. | Insurance | 15 |
| 22. | Indemnification | 16 |

23.   Haulage Roads . . . . . . . . . . . . . . . . . . . . . .   17

23A.  Underground Haulage . . . . . . . . . . . . . . . . . . .   17

24.   Mining Permits  . . . . . . . . . . . . . . . . . . . . .   17

25.   Termination and Default . . . . . . . . . . . . . . . .   19

26.   Equal Employment Opportunity  . . . . . . . . . . . . .   23

27.   Survival Clause; No Waiver  . . . . . . . . . . . . . .   23

28.   Relationship of Parties; Full Understanding;
      Modification  . . . . . . . . . . . . . . . . . . . . .   24

29.   Nonassignment . . . . . . . . . . . . . . . . . . . . .   24

30.   Security Agreement; Offset  . . . . . . . . . . . . . .   25

31.   Time Element  . . . . . . . . . . . . . . . . . . . . .   26

32.   Cross-Default . . . . . . . . . . . . . . . . . . . . .   26

33.   Notice to the Parties . . . . . . . . . . . . . . . . .   26

34.   Headings  . . . . . . . . . . . . . . . . . . . . . . .   27

35.   Governing Law . . . . . . . . . . . . . . . . . . . . .   27

CONTRACT MINING AGREEMENT

This <u>CONTRACT MINING AGREEMENT</u>, made and entered into
this ___*10*<sup>th</sup>___ day of ___*June*___, by and between <u>SIDNEY</u>
<u>COAL COMPANY</u>, <u>INC</u>., a corporation, hereinafter called "Owner,"
and <u>"NEW ERA" COAL CO</u>., <u>INC</u>., a corporation, hereinafter
called "Contractor."

WHEREAS, Owner has the right to mine certain coal-bearing
properties pursuant to certain deeds, leases, subleases, or
contractual arrangements (the "Premises"); and,

WHEREAS, Owner desires to engage Contractor in the
capacity of an independent contract miner, and for those per-
sonal services and skills which Contractor can specifically
provide, to mine and deliver certain coal from the Premises
for a fixed sum cash payment per clean ton, and Contractor
desires to accept such engagement.

W-I-T-N-E-S-S-E-T-H-:

NOW, THEREFORE, in consideration of One Dollar cash in
hand, and of the mutual covenants, benefits, and undertakings
hereinafter set forth, the sufficiency all of which is hereby
acknowledged, Owner and Contractor agree as follows:

1.  <u>Definitions</u>.  As used in this Agreement, "Mineable
and Merchantable Coal" means coal, when mined in conjunction
with the Contractor's operations, which can be cleaned and/or

sold by the Owner at a reasonable profit under prevailing market conditions, in Owner's sole judgment.

2. <u>Employment of Independent Contractor.</u>

a. Except as herein otherwise provided, Contractor agrees to furnish all sufficient, necessary, and incidental services, manpower, equipment, machinery, tools, power, fuel, explosives, water, materials, and supplies to perform the mining services herein contemplated, or as otherwise agreed by Owner and Contractor.

b. It is expressly agreed that Contractor will carry out the services contemplated by this Agreement as an independent contractor who has a possessory status of the Premises as a tenant at will. It is the intention of the parties that Owner has engaged Contractor to mine and deliver certain coal pursuant to this Agreement. It is understood by the parties that the Contractor shall exercise complete and exclusive control over the mining activity, over its employees, and over the labor relations with its employees. The Contractor shall exercise complete and exclusive control over its employees, to employ, to discharge, and to fix the compensation of all its own employees, and the Contractor shall be solely responsible for all such payments.

Contractor shall be chargeable and shall take care of all duties, obligations, and records arising out of its employee and employer relationship. Owner shall exercise no control of Contractor's employees or mining operations

2

hereunder, and Contractor shall conduct all its operations
hereunder in such manner as to do the least possible damage to
Owner's Premises or to the property of any other person.
Owner shall have the right of inspection at all times of the
Premises and of the mining operations of the Contractor to
insure compliance with the terms and provisions of this
Agreement. Nothing herein shall be construed as creating a
single enterprise, joint venture, landlord-tenant, or
employer-employee relationship between Contractor and Owner.
Contractor is not and shall not represent itself to be a
partner, agent, or representative of Owner. The covenants,
conditions, and terms of this Agreement shall be for the sole
and exclusive benefit of the parties hereto and their
respective permitted successors and assigns to the exclusion
of the rights of any third-party beneficiaries.

       c. Contractor shall, under the terms and con-
ditions herein, produce for Owner, by modern and efficient
mining methods, and with due regard for future mining, the
mineable and merchantable coal located in Pike County, the
Premises, and by reference to the attached map, marked as
Exhibit C. Contractor shall mine the Pond Creek seam of coal
within the area described and outlined on the attached map.
Contractor shall, as from time to time directed by Owner,
produce and deliver coal, and Contractor agrees to perform the
work and services (the "Work") required under this Agreement
upon the terms and conditions as provided herein. Contractor

agrees to mine the coal on the Premises under the same limitations and restrictions of Owner's title or lease, and OWNER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF THE EXISTENCE OF THE QUANTITY OR QUALITY OF THE COAL PREMISES, OR OF ITS MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE ARISING FROM COURSE OF PERFORMANCE, OR DEALING, OR USAGE OF TRADE. Owner further permits the Contractor the right to operate and maintain haulage roads on and over the Premises, and further permits Contractor the right to construct, operate, and maintain in and upon those lands such buildings, equipment, improvements, and roadways as may be required by Contractor in connection with the performance of the terms of this Agreement to the extent that Owner has these rights; provided, however, that the construction of all roads, ponds, or permanent improvements must be approved by Owner.

      d.    Contractor shall deliver to Owner the coal mined hereunder at a minimum daily rate of twelve hundred tons of clean coal per day, but in no event less than twenty thousand tons of clean coal per month. All coal delivered hereunder shall be delivered by Contractor to Owner at Owner's silo at Road Fork, Pike County, Kentucky.

      3.   Nonexclusive Right to Mine; Direction of Owner. It is understood and agreed by the parties that neither the designation by Owner of any particular place or area from which Contractor is to mine the coal nor supplying a plan of mining and projections of mining operations at such place or

in such area shall imply or give rise to any exclusive right in the Contractor to mine all of the coal at such place or in such area, but only so much thereof as Owner may from time to time direct or permit Contractor to take. OWNER MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, AS TO THE LENGTH OF TIME OF CONTRACTOR'S OPERATION. The use of the Premises by Owner or its successors and assigns shall not unreasonably interfere with the operations of Contractor as provided herein.

4. <u>Prior Investigation By Contractor</u>. Contractor accepts the Premises hereinabove described in their existing condition and acknowledges that Contractor has made an investigation to determine existing conditions, limitation of the areas involved, equipment necessary to conduct and complete operations, laws affecting performance hereunder, and Owner's knowledge of prior mining and the location of old works. <u>OWNER MAKES NO IMPLIED OR EXPRESS WARRANTY OR REPRESENTATION CONCERNING THE EXISTENCE, QUANTITY, QUALITY, MINEABILITY OR MERCHANTABILITY OF THE COAL SEAM WITHIN THE PREMISES, TITLE THERETO OR OTHERWISE AND CONTRACTOR COVENANTS AND AGREES THAT NO REPRESENTATIONS, STATEMENTS OR WARRANTIES, EXPRESS OR IMPLIED, HAVE BEEN MADE BY OR ON BEHALF OF OWNER REGARDING THE PREMISES, THEIR CONDITION, THE USE OR OCCUPATION THAT MAY BE MADE THEREOF OR THE INCOME THEREFROM.</u> Owner shall in no event assume or be liable for any loss incurred by Contractor under this agreement. Owner does not assume any

responsibility or liability for the present or future condition of the Premises and Owner shall not be liable to Contractor for any damage to or destruction of the Premises or Contractor's property or the property of any other person due to fires, floods, or any other accident or other natural catastrophe which occurs on or within the Premises.

     5.    <u>Conformity With Laws</u>.  Contractor agrees to conduct its operations under this Agreement in conformity with all applicable laws, rules, and regulations, now or hereafter in effect, made by the authority of the local, state, or federal governments.

     6.    <u>Term of Agreement</u>.

       a.    Unless sooner terminated or cancelled as hereafter provided, the term of this Agreement shall be for a period of five (5) years from the date of execution and delivery hereof; however, either Owner or Contractor shall have the right to terminate this Agreement at any time during the term by giving thirty days written notice of intention to terminate to the other party, in which event this Agreement shall terminate at the expiration of a period of thirty days after the giving of such written notice of termination.

       b.    All other provisions of this Agreement notwithstanding, it is agreed that this Agreement shall automatically terminate upon the exhaustion of the mineable and merchantable coal within the Premises.

7. <u>Payments</u>.

a.    Owner will pay to Contractor, as sole and exclusive consideration to Contractor for the services to be performed by Contractor under this Agreement, a payment according to the attached pay schedule as Exhibit A per net ton of clean merchantable coal of two thousand pounds as determined by the float-sink method.

b.    Clean coal for which payment shall be made to Contractor shall be calculated by standardized float-sink or washability tests approved by Owner with provision for theoretical plant inefficiency.  The parties acknowledge and understand that the preparation plant operates at various specific gravity levels during any given period.  Consequently, the standardized float-sink calculation may not accurately reflect the amount of coal and ash recovered or disposed of over any time period.

c.    The price per ton paid by Owner to Contractor as described in Exhibit A shall include any improvements and rehabilitations performed by Contractor in the mine and of the outside support facilities during the term of this Agreement, and Contractor shall have no right in such improvements and/or rehabilitations upon termination of this Agreement, and all such property and improvements shall become the property of the Owner.

7

8.  **Force Majeure and Right to Refuse Delivery.**

a.    Owner or Contractor shall be excused from delay or failure to perform any work, services, or other commercial transaction contemplated hereunder (other than equipment lease, rental, or installment sales payments) in the event of frustration of purpose, commercial impracticability, or any events of force majeure beyond the reasonable control of either party.  General statements of events of force majeure, frustration of purpose, and commercial impracticability shall not be limited by the rule of ejusdem generis.  Whether or not foreseeable, events of force majeure, frustration of purpose, and commercial impracticability include, but shall not be limited to: fires, floods, labor disputes, strikes, railcar shortages, barge shortages, acts of God, insurrection, damage to or breakdown of plants, trucks, or other equipment.

b.    Coal to be mined and delivered but delayed, lost, or not mined or delivered due to an event of force majeure, frustration of purpose, or commercial impracticability shall not be made up except by mutual agreement.

c.    Upon the occurrence of an event as described in Paragraph 8a above, either party may suspend in whole or in part the work, services, or coal delivery and acceptance.

d.    Owner at any time may reject a particular quantity or shipment of coal if such contains unnecessary extraneous material, and Owner shall have the right at any time to refuse to accept delivery of coal hereunder whenever

such coal is of such poor quality so as to render it unmar-
ketable, or whenever, because of market conditions, it is
unable to sell such coal at a reasonable profit to itself, or
whenever it is unable to dispose of the coal or to transport
the coal as a result of railroad car, truck, or barge short-
ages, or due to any event contemplated in Paragraph 8a above,
whether or not foreseeable, or whether or not beyond the
reasonable control of Owner.

9.    Time of Payments.  Owner shall pay Contractor as
determined in Exhibit A for the estimated coal delivered
during those periods within ten days after the fifteenth and
thirtieth of each month.  Owner will pay Contractor the
balance for the actual adjusted tonnage delivered each month
on the fifteenth day following the last payment.  Failure to
object to any payment within thirty day after adjusted payment
shall conclusively establish the adequacy of such payment.

10.    Scales.  Payments to be made to Contractor by Owner
as herein provided shall be determined based upon truck scale
weights, or upon railcar weights furnished to Owner, with
adjustments made pursuant to actual determinations made
pursuant to Paragraph 7.

11.    Books of Account; Right to Audit.  Contractor shall
keep books of account to the quantity of coal produced and
delivered as provided herein, and said books shall be open at
all reasonable times for inspection by Owner or its agents for

9

the purpose of comparing or verifying the reports rendered by Contractor under the terms of this Agreement.

12. _Repairs of Premises_. Contractor shall at its own cost maintain the Premises, including ponds, and all appurtenances thereon. If Contractor fails to make any repairs for which it is responsible, Owner shall have the option to make the repairs, and Contractor shall immediately reimburse Owner for the cost of the repairs. The making of the repairs by Owner shall not be construed as a waiver of duty of Contractor to make repairs required by this Agreement.

13. _Alteration of Premises_.

a. Contractor may make alterations and additions to the Premises only with the prior written consent of the Owner and only after Contractor has secured all necessary permits and approvals from state and federal authorities.

b. If any repairs, alterations, or additions are made by Contractor, Contractor shall pay promptly for all the labor or materials furnished, and Contractor shall keep the Premises and the interest of Owner therein free from any lien or encumbrances of any kind.

14. _Fines and Penalties_. Contractor shall be responsible and solely liable for the payment of any assessments, penalties, or other fines imposed by any federal, state, or local agency, and for any violation of any federal, state, or local law or regulation arising out of the conduct of Contractor's operations hereunder. If Owner is fined or assessed

a penalty for which Contractor is responsible, Owner may compromise and settle any claims for fines or penalties without the approval of the Contractor. Should Owner be assessed or fined for any such violation arising out of the conduct of Contractor's operations under this Agreement, Contractor shall fully reimburse Owner for payment made to any federal, state, or local agency in satisfaction of such fine or penalty.

15. <u>Owner Payments.</u> Owner covenants and agrees:

a. to pay all royalties and other payments that may be required pursuant to the Owner's aforesaid coal rights for the coal mined and delivered to Owner hereunder; and

b. to pay all severance taxes applicable to the coal mined and delivered to Owner hereunder, the per ton reclamation fee or tax (now 15¢ per ton) which may be required to be paid under the Surface Mining Control and Reclamation Act of 1977, and the black lung excise tax (now $1.10 per ton) imposed for black lung benefits under the Black Lung Benefits Act of 1977.

16. <u>Taxes and Assessments.</u>

a. Except as otherwise provided in Paragraph 15, Contractor warrants and agrees to pay all taxes and all other assessed monetary obligations incident to the services to be performed hereunder, the Work, and to its operations, as well as such property taxes as may be assessed against any property or improvements which it may possess upon Owner's Premises, or in connection with its performance under this Agreement.

11

Contractor shall submit on a quarterly basis to Owner proof of payment of all taxes or assessments due to any federal, state, or local agency.

b.  Contractor shall also pay all contributions, taxes, and premiums payable under federal, state and local laws measured upon the payroll of employees engaged by Contractor in the performance of the terms of this Agreement and (except as otherwise provided in Paragraph 15) all sales, use, excise, transportation, business and occupation, and other taxes applicable to materials and supplies furnished or work performed hereunder, and Contractor shall save Owner harmless from liability for nonpayment of all such contributions, taxes, and assessments.

17.  <u>Workers' Compensation</u>.  Contractor warrants and agrees to pay all monetary obligations incident to the Contractor's business and its employees regarding workers' compensation as may be required under KRS Chapter 342 and regarding federal black lung benefits as required by applicable federal statutes and regulations.  Contractor shall promptly furnish to Owner evidence of financial responsibility with respect to payment of workers' compensation coverage and black lung benefits.  Unless otherwise agreed to by Owner and Contractor, such evidence of financial responsibility shall consist of a semiannual submission to Owner of a certificate of coverage and insurance from Contractor's insurance carrier.

18.  **Engineering and Special Services.**  Unless otherwise agreed, Owner agrees to provide for Contractor the mine maps and projections and the necessary engineering work to include the surveying of mine work, running mine levels, ventilation maps, and other engineering requirements for Contractor.  For these engineering services, Contractor agrees to pay Owner the amount shown in the Authorization Agreement, attached hereto as Exhibit B.  Contractor shall provide, at its expense, sufficient personnel to guard the Premises on a seven day per week basis for twenty-four hours for each such day.

19.  **Depletion.**  It is understood and agreed that Contractor does not acquire under this Agreement any economic interest in any coal owned or held under lease by Owner, and Owner shall have the full right of percentage depletion or of other depletion for income tax purposes or for any other purpose on all of the coal mined, produced, and delivered by Contractor hereunder, and Contractor specifically agrees that it will make no claim whatsoever to any such depletion through its income tax accounting and returns or in any other manner.

20.  **Use of Owner's Equipment.**  Owner consents to the use of its coal mining equipment by Contractor, which equipment is as shown on the attached Exhibit D, solely for the purposes of mining coal on the Premises for a period concurrent with the terms of this Agreement, upon the express condition that:

a.  Said equipment shall not be removed from the Premises.

13

b. Contractor shall not assign, sublet nor pledge the equipment as security for any loan(s) or indebtedness of any nature, nor permit said equipment to be encumbered in any manner whatsoever.

c. Owner makes no warranty or representations, either express or implied, as to the fitness, quality, design, conditions, capacity, suitability, or performance of the equipment, or of the material or workmanship thereof; it being agreed that Contractor is permitted to use the equipment "as is," and that all such risk in the use of said equipment by Contractor is at its sole risk and expense.

d. Contractor, at its own expense, shall keep the equipment in good and efficient working condition, and shall make such repairs and replacements thereto as may be necessary to keep the same in such condition.

e. As provided hereafter in Paragraph 22, Contractor shall indemnify Owner against, and hold Owner harmless from, any and all claims, actions, suits, proceedings, cost, expense (including reasonable attorney fees), damage and liabilities arising out of its possession, use, or operation of said equipment.

For failure by Contractor to observe and fully comply with the provisions respecting its use of said equipment, as above set forth, Owner, in addition to any other remedies it may have, shall have the right to declare Contractor in

14

default of this Agreement, and at its election, to terminate same pursuant to Paragraph 25.

21. <u>Insurance</u>. Contractor warrants and agrees at its own cost and expense to take and carry coal mine and comprehensive general liability insurance with combined single limits of two million dollars and to take and carry comprehensive general liability automobile insurance including insurance for nonowned and hired cars, with combined single limits of two million dollars. The Owner does not express any opinion as to the sufficiency of the above liability limits. Contractor shall take and carry the minimum insurance above on an annual basis, with a company acceptable to Owner and shall furnish to Owner a policy of such coverage in manuscript form, which shall be acceptable to Owner, prior to commencing the Work under this Agreement. This insurance shall include Owner as an additional named insured, such insurance to be primary and not contributory as to any other insurance Contractor shall have in effect. This insurance policy and certificate shall include contractual liability coverage with specific reference to the contractual obligations contained in this Agreement and shall contain a cross-liability clause. The Contractor may, at its sole discretion, insure for direct property damage its vehicles, mobile equipment, or other physical assets at or about the Premises, and the Contractor will cause its insurers to waive their rights of subrogation against the Owner, its affiliates and subsidiaries, and their

directors and officers, employees and agents, and other mining contractors working on the Owner's premises. If uninsured for property damage, the Contractor renounces any rights of recovery against the Owner, its affiliates and subsidiaries, and their directors and officers, employees and agents, or other mining contractors on the Owner's Premises.

22. _Indemnification._ Contractor warrants and agrees to indemnify and save Owner, and its affiliates and subsidiaries, their directors and officers, agents, employees and their affiliates, harmless against any and all claims, damages, loss and expense, consequential damages (including attorney's fees and other legal expenses) by reason of (i) liability imposed or claimed to be imposed by law upon the Owner because of bodily injuries (including death at any time resulting therefrom), or on account of damage to property, which is sustained by any person or persons, including the Contractor's own employees, and which arises out of or in consequence of the performance of the Work called for by this Agreement; (ii) any fine, penalty, assessment, or charge of any kind for violation of any applicable statute, regulation, or lawful directive; and (iii) any such liability or charge against Contractor or anyone directly or indirectly employed by it or its agents, invitees, or licenses. This indemnity shall be provided whether or not such injury, damage, fine, penalty, assessment, or charge arises out of or is claimed to have arisen in whole or in part out of negligence or any other grounds of legal

16

liability, including violation of any duty imposed by a statute, ordinance, or regulation, on the part of any person, the Contractor, the Owner, or any of either's employees or agents.

23. **Haulage Roads.** Unless otherwise agreed, Contractor shall maintain all roads required to provide access to and upon the Premises and for the haulage of coal to a designated loading point. The location of additional roads shall be subject to the approval of Owner. Contractor shall also properly maintain any pond or ponds on the Premises, even if they are not utilized in the exercise of Contractor's rights under this Agreement.

23A. **Underground Haulage.** Contractor shall, at all times, insure that underground railways and haulways (track) are built and maintained to within five hundred feet of the mine section dump point.

24. **Mining Permits.**

a. Unless otherwise agreed, Contractor shall obtain all necessary state, federal, or local mining permits and a Mine Safety and Health Administration identification number for all operations hereunder. Contractor agrees, upon termination or cancellation of this Agreement by either party, to transfer or surrender, as requested by Owner, any and all mining permits and/or mining agreements obtained by or for the Contractor for mining operations, as Owner shall direct.

b.    To effectuate the rights and interests in Paragraph 24a above, the Contractor hereby irrevocably appoints the Owner its true and lawful attorney, with power of substitution, for the Contractor and in the Contractor's name, or in the Owner's name or otherwise, for its use and benefit, (i) to assign, transfer, surrender, cancel, or terminate and take any other action with respect to or otherwise deal with the federal and state mining permits and licenses issued to or held by the Contractor, as fully and completely as if the Owner were the permittee or licensee thereunder, and (ii) to make, execute, acknowledge, and file any documents or instruments which may be required in or to effectuate such assignment, transfer, cancellation, termination, or other action with respect to such permit.

c.    The power of attorney granted in this paragraph shall survive termination of this Agreement and shall survive the liquidation, dissolution, death, or incapacity of the Contractor. The powers conferred on the Owner by this paragraph are solely to protect its interests and shall not impose any duties upon the Owner to exercise any such powers. Contractor agrees to execute and deliver to Owner an instrument in recordable form, as provided for in KRS 382.300, titled "Power of Attorney," to effectuate the purposes of this Paragraph 24.

25. Termination and Default.

     a.   If action by Contractor in performing work or services under this Agreement shall cause interference with or disrupt, or threaten to interfere with or disrupt, Owner's operations in any manner or any of its affiliates or subsidiaries, or the operations of any contractor (to Owner) or its affiliates or subsidiaries, at any location whatsoever, whether by reason of a labor dispute, picketing, boycotting, or otherwise, or if the presence of Contractor or Contractor's agents or employees upon Owner's Premises or the fact that this Agreement has been made results in acts by third parties which interfere with or disrupt, or threaten to interfere with or disrupt, Owner's operations in any manner, at any location whatsoever, whether by reason of a labor dispute, picketing, boycotting, or otherwise, Owner may in any such event, terminate this Agreement upon one day's notice in writing to Contractor.

     b.   If Contractor shall fail to promptly commence and diligently prosecute its operations hereunder in a careful, skillful,, and workmanlike manner; to conduct its operations hereunder in strict compliance with all applicable state and federal laws, regulations, and permits; to, where required, secure all necessary permits, licenses, and identification numbers, and pay all fees in connection therewith and fulfill all obligations in relation thereto or provide Owner with copies of the same; to file necessary reports or other

19

documents with applicable governmental offices; to establish and serve notice of Contractor's sole and exclusive responsibility for the health and safety of its employees and agents; to diligently follow mining plans and projections; to permit Owner access to the Premises; to produce and deliver coal at the minimum rates specified herein; to keep accurate records respecting all aspects of its operations hereunder; to permit Owner to examine and survey Contractor's operations and examine its books, accounts, statements, maps, and plans; to furnish all tools, supplies, materials, and equipment; to employ capable management; to expend reasonable necessary funds for proper health and safety measures; to develop reclamation, drainage, and pollution control; to employ, direct, supervise, discharge, and fix the compensation and working conditions and practices of its employees; to employ guard personnel sufficient for insuring twenty-four hour per day, seven day per week protection of the Premises; to pay employees; to pay for and maintain all private and group life, accidental death and dismemberment, health, sickness, and accident insurance which may be required for its employees; to pay any other welfare benefit payments required to be paid to, or on behalf of, or for the benefit of, the Contractor's employees, pursuant to any labor contract with any labor organization representing Contractor's employees; to exercise complete control of its employees in all matters, disputes, or grievances hereunder; to insure and keep insured its liability

for workers' compensation as an employer subject to KRS 342.340; to maintain coverage for its employees, or maintain insurance for, and guarantee the payment of applicable state and federal black lung benefits for its employees in accordance with applicable state and federal statutes and regulations; to conduct its operations in full compliance with all applicable state and federal laws and regulations; to certify to Owner compliance therewith; to carry liability insurance as required hereunder; to provide Owner with a certificate of insurance as required hereunder; to pay all taxes imposed or assessed against it; to comply fully with all provisions contained in Paragraph 20 relating to the use of Owner's equipment; to build and maintain underground railways and haulways (track) to within five hundred feet of the mine section dump point; or to otherwise comply with any of the terms or provisions of this Agreement, then Owner unilaterally and immediately may declare Contractor in default.

   c. If at any time Contractor shall be in default or breach of any term, covenant, obligation, or condition of this Agreement, Paragraph 25b, Owner may give the Contractor written notice of the condition of breach and demand that it be cured or corrected.  If not cured or corrected in accordance with Owner's notice within five days after notice is sent, Owner may declare this Agreement immediately terminated. All events or conditions listed or occurring in Paragraphs 25a, b, and c are deemed material.

d.    Upon termination or cancellation for any reason, Contractor shall have an additional period of thirty days in which to remove its mobile equipment only, and if it shall not have removed the same within such period, then all such equipment may be purchased by Owner at fair market value and then shall become the property of Owner.  In addition, upon termination of this Agreement, all mining "fixtures" shall remain a part of and installed on the mine Premises. Such fixtures, whether installed by Owner or Contractor, or purchased by the Contractor and not yet having been installed, are deemed to have been included in the contract price paid for coal mined by the Contractor.  Such fixtures shall include, but not be limited to, installed timbers, crib blocks, brattice and line curtains, track, trolley lines, power lines, water lines, stoppings, roof bolts, and any other equipment that is not mobile. Installations of equipment necessary to continue the operation of the mine such as miscellaneous spare parts not yet fixtures or installed, but which eventually would be installed if mining were to continue by the Contractor, may be purchased by Owner, if it so desires, at a mutually agreed upon price, or at a price fixed by a competent appraiser.

e.    Remedies for holding over

(i)    In the event that Contractor remains on the Premises after the Term of this Agreement, or after Owner has declared default and cancellation, or without the express

written consent of Owner, then Owner may by any peaceful means and at any time, enter and take possession and control of the Premises without demand or notice to Contractor.

(ii)  In the event that Contractor remains on the Premises after the Term of this Agreement, without the express written consent of Owner, or after Owner has declared default and cancellation, then Owner, in addition to any other remedies provided for in this Agreement, or at law or in equity, may seek a writ of forcible entry under KRS 383.200 et seq.; provided, however, that the parties specifically agree that under no circumstances of law or fact shall the relationship of Owner and Contractor be, or be presumed to be, that of landlord and tenant.

26.  Equal Employment Opportunity.  During the performance of this Agreement, the Contractor agrees not to discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Contractor agrees to comply with all of the provisions of Executive Order 11246 of September 24, 1965, and with the relevant rules, regulations, and orders of the Secretary of Labor.

27.  Survival Clause; No Waiver.

a.  Notwithstanding any termination or cancellation of this Agreement, any obligation by either party hereto which has not been fully observed or performed shall survive such termination or cancellation.

b.   The failure of Owner to enforce any specific breach by Contractor of this Agreement or portion of this Agreement shall not be deemed to be a waiver of any subsequent breach thereof, or of any other cause of cancellation or forfeiture, whatever or however occurring.  The termination or cancellation of this Agreement shall not invalidate or terminate any of the indemnities, warranties, or representations of this Agreement.

28.   Relationship of Parties; Full Understanding; Modification.   It is understood and agreed by and between the parties hereto that the relationship between them is in every respect that of Owner and independent Contractor and that this Agreement shall be performed accordingly; that this Agreement contains the full understanding and agreement between the parties hereto and that the same may not be modified, added to, or changed in any particular, except by mutual agreement by the parties reduced to writing and signed by them.   All Addenda hereto are incorporated herein and are an integral part of this Agreement.

29.   Nonassignment.  Contractor shall not assign, pledge, or sublet this Agreement or any part of this Agreement, or the services or work to be performed hereunder, without the prior written consent of Owner.  The parties hereto expressly recognize this Agreement to be a "Personal Services Agreement," and Owner relies expressly on the personal abilities of Contractor. Any whole or partial sale of stock or assets of Contractor

shall be deemed an assignment hereunder, and Owner may cancel this Agreement immediately at its option upon any such assignment or sale, or attempted assignment or sale of stock or assets of Contractor or upon the subletting of this Agreement or any portion thereof.

30. <u>Security Agreement; Offset</u>.

a. In the event that Owner makes cash advances to Contractor, or Owner pays certain obligations set forth in Exhibit B hereto on behalf of Contractor for which Owner is not concurrently reimbursed, then the Contractor hereby grants to Owner a continuing security interest in all existing and after-acquired accounts receivable, goods, cash, certificates of deposit, negotiable instruments, fixtures, proceeds, machinery, equipment, and any and all other personal property of the Contractor to secure any obligations of the Contractor to Owner, whether now existing or hereafter arising, under this Agreement or any other instrument, including any damages for failure to fully perform or observe its obligations hereunder or thereunder. The parties hereto specifically intend this Agreement to be a Security Agreement.

b. Contractor hereby irrevocably assigns to Owner the accounts and general intangibles hereunder, and agrees to permit Owner to offset from any sums due to Contractor from payments to be made hereunder, any amounts which Owner has paid for Contractor, including, but not limited to, wages, taxes, workers' compensation, engineering work, equipment

lease payments, or any other state or federal statutory or regulatory assessment or other contractual payment, or reclamation work performed on behalf of Contractor.

c. In the event that Owner makes such cash advances or pays such obligations as set forth in this Paragraph 30, then Contractor warrants and agrees to execute a UCC-1 financing statement, or other similar instrument, to effectuate the purposes of this Agreement.

31. __Time Element__. Contractor and Owner agree that time is of the essence of this Agreement.

32. __Cross-Default__. If Contractor shall default on any other agreement, or the conditions or warranties thereto, to which the Owner and Contractor are parties, then such default under any such other agreement shall be deemed a default hereunder.

33. __Notice to the Parties__. The giving of any notice to, or the making of any demand on, Contractor under the provisions herein shall be sufficient if made in writing, addressed to Contractor at:

> "New Era" Coal Co., Inc.
> 29501 Mayo Trail
> Catlettsburg, Kentucky   41129
> Attention:   President

or such other address as Contractor may hereafter in writing designate, and mailed postpaid, certified, return receipt requested, United States mail. The giving of any notice to,

or the making of any demand on, Owner under the provisions herein shall be made in writing, addressed to:

Sidney Coal Company, Inc.
Post Office Box 299
Sidney, Kentucky 41564
Attention: President

or such other address as Owner may hereafter in writing designate, and mailed postpaid, certified, return receipt requested, United States mail.

34. **Headings.** Paragraph headings or titles used in this Agreement are for convenience of reference only and shall not affect the construction of any paragraph herein.

35. **Governing Law.** This Agreement shall be governed by the laws of the Commonwealth of Kentucky.

IN WITNESS WHEREOF, the Owner and Contractor have caused this writing to be signed in their respective corporate names by their respective duly authorized officers, in duplicate, and each represents and warrants that the signer has proper authority to enter into this Agreement on behalf of Owner and Contractor, respectively, all as of the date and year first written above.

SIDNEY COAL COMPANY, INC.,
a corporation,

By _Charles L. Hanvely_
Its _PRESIDENT_

27

"NEW ERA" COAL CO., INC.,
a corporation,

By _Roger L. Kirk_

Its _President_

Payment Addendum

1. <u>Payment</u>.[1]  Owner agrees to pay to Contractor, under the terms and conditions of the Contract Mining Agreement, for each ton of two thousand pounds of mineable and merchantable clean coal delivered, as follows:

      a.    from the date hereof and for the ensuing ninety days, the amount of Seventeen Dollars ($17.00);

      b.    thereafter, for the next ninety days, the amount of Sixteen Dollars ($16.00);

      c.    thereafter, for the next ninety days, the amount of Fifteen Dollars ($15.00); and,

      d.    thereafter (after this Agreement has been in force and effect for 270 days), the amount of Fourteen Dollars and Fifty Cents ($14.50).

Provided, however, during the first 30 days described in Paragraph 1a, if Contractor so chooses as an alternative to the per ton payment above set forth in Paragraph 1a, the payment shall be the reasonable cost of labor and materials to Contractor of performing the Work, (which reasonable costs

---

[1]

The above set forth decreasing per ton rate base is intended by the parties to allow for anticipated Contractor problems and expense that the parties recognize are inherent with startup.

shall be determined by Owner in its sole discretion, upon proof furnished by Contractor) plus the amount of Six Thousand Dollars ($6,000.00).

2. Calculation. The contract price to be paid Contractor shall be based upon a float-sink analysis of random samples of coal delivered by Contractor to Owner. Sampling procedures for purpose of ascertainment of clean coal upon which payments shall be made by Owner to Contractor are as follows:

a. Samples shall be taken during each week on a regular basis.

b. Samples taken during the first and last fifteen days of each month shall be prepared for an ultimate sample to be used in performing a float-sink test thereon on a semi-monthly basis.

c. Samples taken under Paragraphs 2a and b shall be mixed thoroughly, coned, and quartered in accordance with ASTM or other Owner selected testing/laboratory procedures and reduced to a size appropriate for a float-sink test.

d. Prior to performing the float-sink test, the sample first shall be air dried to a one percent or less moisture content and then shall be weighed. All moisture content over seven percent shall be considered reject material.

e.  A float-sink test shall then be performed upon the sample in an organic solution at a specific gravity of 1.50.

f.  After drying of the float material, the float material shall be weighed and reject determination shall be calculated.

Clean coal for which payment shall be made to Contractor shall be the raw coal tonnage weights delivered multiplied by the percentage of float material at the 1.50 specific gravity level as ascertained through the above procedure, less an additional three percent deduction to allow for theoretical plant loss.

SIDNEY COAL COMPANY, INC.,
a corporation,

By _Charles L. Amvele_
Its _PRESIDENT_

"NEW ERA" COAL CO., INC.,
a corporation,

By _Roger L. Kirk_
Its _President_

A - 3

EXHIBIT B

Authorization Addendum for Deductions

Contractor has determined that it desires for ease of bookkeeping, and because of limited resources and personnel, to allow Owner to make certain deductions from monies due and owing Contractor for coal mined and delivered, and to allow Owner to make certain payments on behalf of Contractor, which shall be deducted from payments to be made to Contractor for the services to be performed under the Contract Mining Agreement. Contractor therefore authorizes and requests Owner to deduct from monies due Contractor under the Contract Mining Agreement the following items and the base rates indicated:

|  |  | Base Rate Per Clean Ton Unless Otherwise Indicated | To Be Remitted To: |
|---|---|---|---|
| ( ) | Workers Compensation Ins. | | |
| ( ) | Loan Payment | | |
| (X) | Electric Power | $.40 | Owner as reimbursement |
| (X) | Engineering and Special Services | $.10 | Owner as reimbursement |
| ( ) | Insurance | | |
| ( ) | UMWA Royalty | | |
| ( ) | Other | | |

Contractor will supply appropriate information where needed to Owner to assure proper amounts are deducted from its settlement figure. OWNER'S SOLE RESPONSIBILITY WITH RESPECT TO THESE DEDUCTIONS SHALL BE TO REMIT TO THE ACCOUNT, AGENCY, OR PERSON THE AMOUNTS DEDUCTED FOR ITEMS AS SET OUT ABOVE.

Contractor agrees that should funds due Contractor not be sufficient under the Agreement to cover the items indicated above, Owner is authorized (but not required) to pay part or all of the amount owed on behalf of Contractor. The sums paid pursuant to this Exhibit B on behalf of the Contractor shall constitute an accelerated payment to Contractor of funds that have not been partially or fully earned under the Agreement. Accelerated payments shall reduce Owner's future payment liability to Contractor which may be collected by any lawful means, including, without limitation, deduction of such advances from any sums due or payable by Owner to Contractor under the Agreement.

SIDNEY COAL COMPANY, INC.,
a corporation,

By _Charles Gravely_
Its _PRESIDENT_

B - 2

"NEW ERA" COAL CO., INC.,
a corporation,

By _____
Its _____



**AREA 4**
8.8 Million Tons Controlled
0.2 Million Tons Not Leased

**AREA 4**  **AREA 7**

**AREA 3 WEST**
1.4 Million Tons Controlled

**AREA 3 EAST**
2.3 Million Tons Controlled
0.2 Million Tons Not Leased

**AREA 7**

EXHIBIT TWO

SCALE 1"=1000'  DATE 6/10/88

**LEGEND**

5.0 MILLION TON RESERVE
POND CREEK SEAM
INCLUDED IN CONTRACT MINING
AGREEMENT FROM SIDNEY COAL
COMPANY INC. TO (NEW ERA)
COAL CO., INC.

ROCK PARTING ANTICIPATED

PM-7
S. EL. 1092'
UPPER BENCH 39.5'
SHALE 7.5'
LOWER BENCH 26'

EXHIBIT D

## EQUIPMENT LIST

| Quantity | Description | Serial No. |
|----------|-------------|------------|
| As Needed | Belt Conveyor Drives, Starters, Transformers, Tailpieces, Conveyor Belt and Belt Structure. | N/A |
| 2 | Joy 14CM8 Continuous Miner | JM3634<br>JM3633 |
| 4 | Joy 21SC Shuttle Car | ET-14578<br>ET-14573<br>ET-13969<br>ET-14574 |
| 2 | Fletcher Model DDO-15CB Roof Bolter | * |
| 2 | S & S 488 Un-A-Trac Scoop | 1852<br>1187 |
| 1 | Stamler Model 17BF-2 Feeder-Breaker | 11841 |
| 1 | 2000-KVA Power Center | 919B019-09 |

* Serial numbers to be provided at a later time.