Case: 7:09-cv-00139-KKC-CJS   Doc #: 40-9   Filed: 04/13/11   Page: 1 of 23 - Page ID#: 480

1993 WL 1609491 (N.L.R.B. Div. of Judges)

National Labor Relations Board

Division of Judges

Atlanta Branch Office

MATE CREEK DEVELOPMENT INC.
AND
UNITED MINEWORKERS OF AMERICA, DISTRICT 17, SUB-DISTRICT 4
AND
RICKEY MARTIN, AN INDIVIDUAL
AND
ROGER D. ADKINS, AN INDIVIDUAL
AND
ARTHUR ROBINETTE, AN INDIVIDUAL
AND
JAMES K. FINLEY, AN INDIVIDUAL

9-CA-29242
JD(ATL)-38-93
Pikeville, KY
October 22, 1993

Louis Dene, Esq., Abingdon, Va. for Respondent.

Sherry Brashear, Esq., Harlan, Ky. for Charging Party.
Don Becher, Esq. Cincinnati, Oh for the General Counsel.

## DECISION

**J. PARGEN ROBERTSON, Administrative Law Judge:**

This case was heard on August 18 and 19, 1993 in Pikeville, Kentucky. The Third Consolidated Complaint issued on November 10, 1992 and was amended on July 21, 1993.

All parties were represented and were afforded full opportunity to be heard, to examine and cross-examine witnesses, and to introduce evidence. Following the close of the hearing, Respondent and General Counsel filed briefs which have been duly considered. Upon consideration of the entire record and briefs filed by the parties, I make the following findings.

## JURISDICTION

The parties stipulated that during the 1992 calendar year Respondent purchased over $50,000 worth of materials and supplies from outside the state of Kentucky which were shipped directly to its Sidney, Kentucky mining operation and that, at all times material, Respondent has been engaged in commerce within the meaning of section 2(2), (6) and (7) of the Act.

I find, in view of the entire record, that Respondent is and has been at material times, an employer engaged in commerce within the meaning of section 2(2), (6) and (7) of the National Labor Relations Act (Act).

## LABOR ORGANIZATION

The parties stipulated that United Mineworkers of America, its District 17 and its Local 2453, are labor organizations within the meaning of Section 2(5) of the Act.

## SUPERVISORS

The parties stipulated that, at material times Joe B. Fields, Sr., James Fain and Garfield Potter have been supervisors and agents of Respondent within the meaning of section 2(11) and (13) of the Act. The parties stipulated that David Webb and Roy Gibson were supervisors and agents of Respondent during the period of their employment with Respondent.

## THE UNFAIR LABOR PRACTICES ALLEGATIONS

The complaint includes allegations of section 8(a)(1), (3) and (5) of the Act. The alleged unfair labor practices followed Respondent taking over coal mining operations at mine number 2 in Sidney, Kentucky after another employer, New Era, went out of business.

### The Section 8(a)(1) and (5) Allegations:

The complaint alleges that the following described collective bargaining unit was represented by the Union when an alleged predecessor employer to Respondent, New Era, operated Respondent's mine number 2 at Sidney, Kentucky; that Respondent was a successor to New Era; that the following described unit continues to be represented by the Union; and that Respondent made unilateral changes in working conditions without bargaining with the Union about those changes:

**All employees of (Respondent) engaged in the production of coal, including removal of overburden and coal waste, preparation, processing cleaning of coal and transportation of coal (except by waterway or rail not owned by (Respondent), repair and maintenance work normally performed at the mine site or at a central shop of (Respondent) and maintenance of gob piles and mine roads, and work of the type customarily related to all of the above at the coal lands, coal producing and coal preparation facilities owned or operated by (Respondent) excluding all coal inspectors, weigh bosses at mines where men are paid by the ton, watchmen, clerks, engineering and technical employees and all professional employees, guards and supervisors as defined in the Act.**

### Findings:

As to the issue of successorship, the record regarding events leading to the issue of Respondent's relationship with the alleged predecessor employer includes evidence showing that the alleged predecessor, New Era, had a contract with Sidney Coal Company to mine property at Sidney, Kentucky. In October 1991 New Era went out of business. As shown below, three former New Era employees testified credibly that they were laid off by New Era on October 18, 1991. Before October 22, 1991, Respondent successfully negotiated a lease of the same mining property from Sidney Coal. Although that lease was not signed until November 1, it was clear to Respondent that the lease was secure and it wrote the United Mineworkers of America on October 22, 1991 regarding its planned work force in the bargaining unit at the Sidney Coal property:

**Mate Creek Development has been awarded a contract mining agreement to mine coal on the Sidney Coal property located at Sidney, Pike County, Kentucky. We are prepared to commence contract negotiations as soon as possible, and would request that you or your designated representative contact me as soon as possible so we may schedule contract negotiations.**

**We look forward to negotiating an early agreement that will mutually benefit all concerned.**

On October 28 UMWA Attorney Sherry Brashear wrote Respondent's attorney:

**This letter is in response to Mr. Jobie Fields' letter of October 22, 1991, to UMWA President Trumka, requesting negotiations, and as a follow-up to a phone conversations with you regarding same. Pursuant to the Settlement Agreement in Case No. 84-338, Mate Creek Development, as the purported replacement contractor, must retain New Era's classified employees as well as assume the special panel obligations in the Settlement Agreement. The UMWA is willing to execute the modified 1988 NBCWA currently in place at that location. However, should Mate Creek wish to**

propose modifications to the existing employment terms which cover these employees the UMWA is willing to negotiate regarding such modifications as required by the Settlement Agreement. Of course, pending resolution of any proposed modifications, the current employment terms of the modified 1988 NBCWA at this location must be honored by Mate Creek.

As already requested, please send me a copy of the contract mining agreement between Mate Creek Development and Sidney so we can confirm its contents and its compliance with the Settlement Agreement. A copy should also go to Judy Scott at the UMWA headquarters.

Looking forward to hearing from you.

The above evidence is not in dispute. The settlement agreement mentioned in Ms. Brashear's October 28 letter, was received in evidence. That agreement was made subsequent to the Union filing suit in the United States District Court for the Eastern District of Kentucky. The document referred to as **settlement agreement** at various times in this decision, was recognized and an order dismissing the suit in view of the settlement, was signed by the Court on May 27, 1988. The Union's suit alleged that the sale of mining properties to Sidney Coal Company was in violation of either the 1981 or 1984 National Bituminous Coal Wage Agreement (**NBCWA**).The settlement agreement indirectly involved Respondent (as was the case before Respondent with New Era) in its position as lessee of the Sidney Coal property. Sidney Coal, and others, entered into the settlement agreement with the Union. As shown herein, the parties do not dispute that the settlement agreement was considered by both parties during negotiations.

The settlement agreement included provisions requiring Sidney Coal to enter into a contract with a contractor to mine properties involved in these proceedings and to employ individuals from a special panel. Those provisions applied to first Sidney Coal's contract with New Era and, subsequently, to Sidney Coal's contract with Respondent.

Respondent President Joseph "Jobie" Fields testified that he is the sole stockholder in Respondent.

Superintendent James Fain testified that when Respondent took over the mine they did not use any equipment belonging to New Era. Respondent did not negotiate at all with the New Era people. Respondent did not assume any of the debts or obligations of New Era.

However, the record shows that Respondent did contract with Sidney Coal to operate the same mine that was operated by New Era.

There is no dispute that the above quoted letters and the November 7 bargaining session discussed below, preceded Respondent starting production operations at the Sidney mine.

It is clear from the undisputed evidence that Respondent voluntarily recognized the Union as bargaining representative of bargaining unit employees from October 22, 1991. Respondent offered to met and negotiate with the Union and Respondent and the Union actually met in a negotiation session on November 7, 1991. Respondent did not initiate operations and actually employ bargaining unit employees until November 18, 1991.

Respondent did employ, in the bargaining unit, employees that had formerly worked in the same mine for New Era.

There is no serious factual dispute regarding the elements normally considered in determining successorship. Respondent employed only bargaining unit employees from those formerly employed by its alleged predecessor employer, New Era.

Although Respondent made improvements in the equipment before starting production, it is clear from the evidence that Respondent engaged in the same business previously conducted by New Era.

Additionally there is no dispute that the employees in the bargaining unit engaged in the same or similar work that was performed by bargaining unit employees under New Era.

Finally the evidence showed that Respondent engaged in the same production process and produced the same product as previously produced and processed by New Era.

In view of the above and in view of the fact that Respondent recognized its obligation to its employees' bargaining representative by offering to negotiate on October 22, 1991, I find that Respondent was a successor employer to New Era. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 125 LRRM 2441 (1987).

General Counsel contended, and Respondent disputed, that Respondent was obligated to negotiate changes in terms and conditions of employment that existed immediately before the alleged predecessor employer, New Era, ceased operations; and that Respondent made unilateral changes in terms and conditions of employment without first negotiating those changes with the Union or bargaining to impasse.

UMWA Attorney Sherry Brashear testified that she was furnished a copy of the contract between Respondent and Sidney Coal Company. That document was received in evidence. Ms. Brashear testified that the Union met with Respondent's representatives on November 7, 1991. Attorney Dene and Respondent President Jobie Fields represented Respondent. Attorney Brashear, Charles Dixon, Local President Arthur Robinette and Don Prathly represented the Union.

Ms. Brashear recalled that Attorney Dene opened the meeting by stating that New Era had gone out of business and that Mate Creek Development, by its president, Jobie Fields, had obtained a contract with Sidney Coal Company, owner of that mine, to mine in the place where New Era had been mining.

Mr. Dene referred to the settlement agreement (in the U.S. District Court action which is described above) and said that Respondent and the Union might differ about the meaning of the agreement but Respondent wanted to get down to cases and the terms of some temporary agreement at least until they could reach agreement on a permanent agreement. Dene said that Respondent was in the process of recalling bargaining unit employees that had worked for New Era, enough to start one section. Dene said the former superintendent at New Era, James Fain, would be Respondent's superintendent and that Fain had selected certain employees to be called to work and had sent notices to them to take their physical examinations. Dene said that Respondent would not be recalling employees in order of seniority. Ms. Brashear recalled that Dene mentioned three groups of employees; some 50 employees that had formerly worked for New Era, that were being employed to initially work for Respondent at the mine; a second group made up of the remaining former New Era employees and that group would have preference in hire over the third group that were employees that formerly worked at Leslie McGinnis and were listed in the **Settlement Agreement**, but had not worked for New Era.

Brashear recalled that Dene told the negotiators that twelve employees would be hired from a company owned by Jobie Fields as contractors to do out-by work and Dene listed the types of work that they would be performing as general inside labor, repairing stoppings and clearing belt. Dene said any subsequent recall would be on the basis of five of the former New Era employees to one contractor employee.

During the November 7 meeting Dene proposed that mechanics would be paid $14 and hour; roof bolters and miner operators would receive $12.50 an hour; shuttle car operators would be paid $11 an hour; and general inside laborers would be paid $10 an hour. Dene proposed three holidays; labor day, Thanksgiving and Christmas. Dene said that Respondent would provide employees with one week of vacation (five work days) after one year; and, if the employee had less than one year, he would receive one twelfth of one week for each month worked. Dene said the employees would be paid from the time they reached the face in the mine and there would be no portal to portal pay. Dene said Respondent would not make UMWA health and welfare payments under either the 1950 or the 1974 plan. Dene proposed that a new plan be created and that Respondent would make a $.60 per hour contribution.

The Union made a counter proposal during the November 7 meeting. The Union proposed that its counter proposal would be temporary until a permanent agreement was reached but for a term no longer than 30 days. The first point was that employees be employed in reverse order of their layoff by New Era. The Union would agree that Respondent would be relieved from making

contributions under the 1950 health and welfare plan but no relief from the 1974 plan. The Union would agree that Respondent could contract out the hauling of coal. The Union proposed wages under the Raw Sales package.

Respondent President Joseph (Jobie) Fields testified that the Union was told during the November 7 meeting that Respondent was there to bargain over the terms of the **settlement agreement** and implement the terms. He recalled that the Union challenged only on the issue of how they would recall the people that had been laid off by New Era. He agreed that although they continued to meet with the Union, they never reached tentative agreement that was accepted by the workers. Eventually a tentative agreement was tendered to the workers but was rejected. President Fields testified that he told the Union attorney they were going to implement certain conditions before they reached final agreement.

Fields testified that he kept some of the New Era bosses, about four of them and they made changes in the equipment - they changed one miner, four shuttle cars, the belt structure and cleaned up the belt. They did a lot of ventilation work and repaired the brattices. Respondent changed the absentee policy and changed to a nine hour work day according to Fields. Fields testified that James Fain did the hiring of hourly employees and Fain followed seniority and qualifications to do the job. The hourly employees were required to complete application forms as well as other pre-hire forms.

At the end of the November 7 meeting there was agreement that the two attorneys, Union and Respondent, would talk and agree to a date for continued negotiations. Ms. Brashear told Respondent not to recall anyone until they had agreement and that if Respondent did recall anyone Respondent should extend to those employees the same terms and conditions of employment they had enjoyed while working for New Era. Brashear cited a case to support her position.

On November 8, 1991 Ms. Brashear wrote Respondent Attorney Dene:

**Our negotiations regarding temporary and permanent agreements with your client, Jobie Fields, are in no way meant to be interpreted as a waiver of our contention that the contract in force when New Era went out of business is still applicable to the employees about whose terms and conditions of employment we are negotiating.**

Superintendent James Fain testified that he was formerly the superintendent with New Era. He started working for Respondent on November 1, 1991. He testified that Respondent started mining operations on November 18, 1991. Fain testified that Respondent hired employees that formerly worked for New Era. Additionally, there were contract laborers used at the mine and those employees were paid by Universal Coal.

Fain testified that he hired employees for Respondent using the panel forms from New Era to select the employee on the basis of seniority and the ability to perform the job that was open at the time. Fain testified that Respondent made several changes in the operations before beginning operations at the mine. The changes were basically in the equipment.

Fain testified that Respondent changed policies including going to a nine as opposed to an eight hour work day; they put into effect a new cable policy and a new absentee policy.

Fain testified that he talked to the new employees and told them that several things would be changed at that operation for them to be effective. He told them that their vacation, holidays and things like that would be changed and that "Mr. Fields and one of their (Union) representatives were discussing that at the present time." Fain denied that he told any of the employees they would be subject to the terms and conditions that New Era had in effect when New Era shut down.

Union attorney Brashear wrote Respondent attorney Dene again on November 18:

**I called you this morning, but you were unavailable. Please call me immediately so we can schedule another session to discuss the issues relating to your captioned client's succession to the mining contract formerly held by New Era Coal Company with Sidney Coal Company. You said you were tied up every day last week. Charles Dixon and I can make ourselves available for a meeting any day, including Saturday.**

**We have been told that Mate Creek plans to begin coal production today using eight classified employees formerly employed by New Era whom it has recalled without regard to seniority. Please understand that, though we have not**

**forbidden these employees to return to work, in so doing, we do not waive our argument that all workers must be recalled in accord with their seniority positions on the "special panel" referred to in the settlement agreement in Pikeville United States District Court Civil Action No. 84-338 as we discussed in our negotiating session on November 7, 1991. I am distressed at your refusal to abide by the plain meaning of this agreement, and hope the United Mine Workers does not have to resort to litigation with A.T. Massey Coal Company, the party with whom it made the agreement, to compel it to force your client to fulfill Massey's obligation.**

**Also, please understand that, as I told you on November 7, 1991, it was, is and will remain, my client's contention that the National Labor Relations Act requires Mate Creek not only to employ the same workers in order of seniority as its predecessor, New Era, with whom it had a labor agreement, but also to extend to those workers the same terms and conditions of employment (including wages, of course) as New Era extended pursuant to the agreement. We contend this state of affairs must continue as long as we are engaged in negotiating a modification of the New Era agreement. Your client's failure either to employ the New Era workers or abide by the New Era terms in any particular is a violation of the Act.**

**Finally, be assured that our forbearance in not refusing to allow those employees requested by Mate Creek to return to work is not to be interpreted by you as a waiver of our belief that, in recalling them as Mate Creek has done, both with respect to order and terms and conditions, and after only one modification negotiating session, your client is violating section 8(a)(5) of the National Labor Relations Act.**

Charles Thacker testified that he had formerly worked for New Era. On November 21, 1991 he started work for Respondent. Thacker is an electrician and he made $17.17 an hour with New Era. He was called to take a physical before starting work for Respondent. He was paid $15 an hour with Respondent. Thacker testified that he did not receive all the holidays with Respondent that he had received with New Era. Thacker testified that he was not told what his benefits and pay would be when he was first hired by Respondent.

On November 22, 1991 Ms. Brashear wrote Respondent Attorney Dene:

**Yesterday Jobie Fields called Hawkeye Dixon and canceled the bargaining session you had scheduled for today in response to my letter to you last Monday. We need to reschedule. I am available Tuesday or Wednesday of next week, November 26 or 27. Please call my office and state your choice of dates and time.**

Negotiations continued and the parties had negotiating meetings on November 27 and December 5, 1991; January 16 and 23, February 11 and 17 and September 3 and 12, 1992.

During the January 23, 1992 negotiating session Respondent argued that it would be difficult to realign the workers who had been recalled out of the order of their seniority. Respondent gave the Union a list of recalled employees with their hire dates at New Era typed in and their hire dates with Respondent written in. The employees listed without a written in date had not been employed by Respondent. Respondent argued that if, as the Union wanted, employees were recalled in order of their seniority from New Era, some of the already recalled employees would be laid off and some of those that had not been employed would have to be recalled.

At the February 17, 1992 meeting, Respondent made an oral contract proposal that included, among other things, an hourly wage scale for unit employees ranging from $12 to $15 per hour. During the September 3, 1992 negotiating session Respondent offered the same proposal in written form.

Ms. Brashear testified that the Union agreed to several specific provisions of contract proposals but the Union never did agree to Respondent's use of contract labor. Other matters, including vacations, were agreed upon. As to vacations, the parties agreed to 10 days vacation after one year.

Venita Branham testified that she is a coal miner with Respondent at Mine number 2. Ms. Branham is the recording secretary for United Mine Workers of America, Local 2453. She was first hired at mine number 2 by New Era.

At the time of the October 1991 layoff at New Era, the laid off employees prepared panel forms which were returned to Ms. Branham in her position with the Union. Each employee listed the jobs he could perform and seniority dates were included. Employees were to be recalled through Ms. Branham with the Union, in accord with information contained in the panel forms.

Venita Branham went to work for Respondent on December 2, 1991, in the same mine where she had worked for New Era.

Venita Branham testified that Respondent did not go through her to rehire employees through the panel forms as had been the practice with New Era.

Ms. Branham testified that when she returned and worked for Respondent at mine number 2, the facility had not changed. The bath houses, one for women and one for men, and the lamp house - all in one building, - the mine office and the supply house had not changed. Neither had the mine equipment.

Venita Branham testified that over one half of the supervisors of New Era were retained in supervisory positions by Respondent including James Fain, Garfield Potter, Buzz Polly, Bill Church, Jack Ousley and Melvin Hurley.

Branham testified that her pay was reduced form $16.35 with New Era to $14 under Respondent even though she retained the same job of shuttle car operator.

After Branham started working for Respondent, she did not know what her pay rate was until she received her first pay check. She noticed then that she was making $14 an hour. She testified that she was not informed of any change in working conditions when she was hired by Respondent. She did not learn of changes until those events occurred.

The parties stipulated that Respondent has never made payments into any sort of pension fund on behalf of its hourly employees.

The successor question was discussed in ***The Developing Labor Law, Third Edition***:

**The bargaining obligation attaches once a successorship exists, that is, once holdover employees constitute a majority of the new, legally sufficient, complement. The underlying question is when the successor employer ceases to be free unilaterally to set initial terms and conditions of employment. Thereafter, on the date when it may be determined that the "majority" test has been met, the successor's position is akin to that of an employer confronted with a newly selected bargaining representative. At that juncture, unilateral changes in existing terms become impermissible. However, if the union fails to make a timely request to bargain, the employer may proceed with implementation of new terms unless such a request would have been futile. *The Developing Labor Law, Third Edition*, pp. 811-812. See also *NLRB v. Burns Int'l Security Services*, 406 U.S. 272, 80 LRRM 2225 (1972).**

In *Turnbull Enterprises, Inc.*, 259 NLRB 934 (1982), the issue was whether the successor employer may set different terms and conditions of employment without first bargaining with the acknowledged collective bargaining representative of the unit employees. The Board affirmed a finding that the Respondent engaged in section 8(a)(5) conduct by unilaterally ceasing to make health and welfare benefit payments in accord with practice established pursuant to a prior collective bargaining agreements.

Where the successor employer announces an intent to employ all the predecessor's unit employees (***The Developing Labor Law, Third Edition***, p. 813, n. 259), and when it is perfectly clear that the successor plans to retain a sufficient number of predecessor employees to pass the majority test, though not all the predecessor employees (***The Developing Labor Law, Third Edition***, p. 814, n. 260; *Applebaum Indus.*, 294 NLRB 981; *EG&G Fla.*, 279 NLRB 444 (1986), the employer has a duty to bargain over initial terms. However, where the offer of employment is tentative or conditioned on the terms offered, the successor has not been required to bargain before setting initial terms and conditions (*Spruce Up Corp.*, 209 NLRB 194 (1974) See also ***The Developing Labor Law, Third Edition***, p. 814-815, n. 262; *Machinists v. NLRB*, 595 F.2d 664, 98 LRRM 2787 (CA DC, 1978).

As shown below, the credited evidence showed that from its October 22, 1991 letter to the Union it was perfectly clear that Respondent planned to retain a sufficient number of New Era employees to pass the majority test and, in fact, all its bargaining

unit employees were former New Era unit employees; and its offer of employment to those former New Era employees was not tentative or conditioned on changed terms and conditions of employment.

General Counsel argued that although Respondent was not obligated to adopt the collective bargaining agreement that existed between New Era and the Union, Respondent was obligated to operate under working terms and conditions as they existed immediately before New Era closed unless Respondent established different terms and conditions before its bargaining obligation matured.

Respondent contends that it informed the Union during the initial negotiation session on November 7 that it planned to implement terms and conditions of employment as specified to the Union during that session. I find that credited evidence does not support Respondent in that regard. I credit the testimony of Union attorney Brashear regarding that negotiating session. I found that Ms. Brashear demonstrated good demeanor. Her testimony was specific and she demonstrated excellent recall. Moreover, I find that the undisputed record, including letters between the parties, supports Brashear's recollection of the November 7 negotiations.

I specifically credit Ms. Brashear's testimony, especially in regard to negotiations. The credited evidence proved that Respondent and the Union talked in terms of a temporary and a permanent collective bargaining agreement. Respondent made proposals for a temporary agreement and the Union made a counter proposal. The evidence including testimony by witnesses for Respondent, shows that the parties did not reach agreement on either a temporary or a permanent contract during the November 7 negotiating session.

As shown below, Respondent did not implement the terms and conditions it proposed to the Union on November 7, 1991. Instead, as shown below, when Respondent actually implemented the initial terms and conditions of employment, those terms differed in material aspects from its November 7 submissions to the Union.

I found that the testimony of both President Fields and Superintendent Fain demonstrated that they did not reveal initial terms and conditions of employment to the Union at any time before they started operations on November 18, 1991. Fields testified that he told the Union of his plan to implement certain conditions before they reached final agreement. Perhaps that was his intent, however, the record shows that the proposals he made to the Union on November 7 were never implemented. Instead, as mentioned above, other terms and conditions, especially as to pay and pension benefits, were unilaterally implemented. Superintendent Fein testified that he told employees they would not receive the same terms and conditions they had with New Era and that Respondent was negotiating with the Union regarding those changes.

I do not credit Fields or Fein especially to the point of initial terms and conditions of employment. For that reason, as well as my crediting the testimony of Ms. Brashear, I find that Respondent did not notify the Union or its employees of all the changes in terms and conditions before implementation of changes. Respondent did advise the Union that it planned to recall employees without regard to seniority but it did not inform the Union as to what it would use to determine order of hire.

The record showed that the terms and conditions initially implemented by Respondent at the start of production, failed to comply with Respondent's November 7 proposals. For example, on November 7 Respondent proposed paying roof bolters $12.50 and hour and shuttle operators $11 an hour. When it began operations on November 18, it paid roof bolters and shuttle operators, $14 an hour. Respondent proposed that it would not make UMWA health and welfare payments under either the 1950 or 1974 plan but that it instead would make a $.60 per hour contribution. The parties stipulated that Respondent has never paid anything toward health and welfare benefits.

I find that Respondent did not inform its bargaining unit employees, before employing any of those employees, that it had changed the terms and conditions of employment in effect before New Era ceased operations. The employees called by General Counsel, including Charles Thacker and Venita Branham, testified that they were not informed of the changed conditions and did not learn of those changes until they learned of them while working for Respondent. I credit the testimony of Thacker and Branham. Both illustrated good recall and excellent demeanor. I do not credit the general testimony of Superintendent Fain that he told employees that their terms and of conditions of employment would be different from the terms and conditions at New Era.

I find that the record evidence illustrated that Respondent recognized the Union as collective bargaining agent of its bargaining unit employees from October 22, 1991 when it knew that it would offer employment to bargaining unit employees formerly employed by New Era. At that time Respondent wrote the Union expressing its desire to negotiate with the Union regarding those employees. During that letter Respondent said nothing about having already set initial terms and conditions of employment which differed from the terms and conditions in effect immediately before New Era ceased operations.

The Union through attorney Brashear, responded to Respondent's offer to met and negotiate, on October 28. In that letter the Union advised Respondent that it would negotiate with Respondent and that it would agree to the modified 1988 NBCWA or, if Respondent wished, it would negotiate changes in terms and conditions, but that until agreement, Respondent was obligated to continue to apply "current employment terms."

As shown above, I credit testimony of Sherry Brashear regarding the November 7 negotiating session. That testimony proved that Respondent did not advise the Union that it was implementing changes in terms and conditions of employment.

During November 1991 Respondent hired and, from November 18, commenced production operations with an initial work force of bargaining unit employees. I find in view of the credited testimony of Charles Thacker and Venita Branham, that Respondent did not advise its employees before their employment of changes in terms and conditions of employment.

Respondent does not dispute, and the record proves, that it initiated terms and conditions of employment of bargaining unit employees that differed from the working terms and conditions under New Era. The credited record also proved that Respondent implemented terms and conditions of employment that differed from proposals Respondent made during negotiations before implementation of those terms and conditions. Respondent unilaterally implemented changes in terms and conditions of employment including the following: Respondent failed to go through the Union agent (Venita Branham) in selecting employees for employment and thereby failed to employ its bargaining unit employees in accord with established practice; Respondent did not select employees on the basis of seniority and there was no showing that senior employees that Respondent passed over were unable to perform jobs that were filled by less senior employees; Respondent used contractor laborers that were not included in the bargaining unit to perform bargaining unit work; Respondent changed the absentee policy; Respondent reduced the holidays available to bargaining unit employees; Respondent changed its daily work hours from eight to nine hours; Respondent lowered the hourly pay for unit employees, Respondent changed vacation entitlement for its employees and Respondent failed to pay pension benefits for its unit employees.

I find that Respondent unilaterally initiated different working conditions after it had recognized and negotiated with the Union as its employees bargaining agent and before it negotiated to agreement with the Union as to those changes and before it had negotiated to an impasse with the Union. See *U.S. Marine Corp. v. N.L.R.B.*, 944 F.2d 1305 (7th Cir. 1991); *A.J.R. Coating*, 292 NLRB 148 (1988); *Worcester Mfg.*, 306 NLRB 218 (1992).

### The Section 8(a)(1) and (3) Allegations:

### (1) Respondent allegedly refused to hire Rickey Martin, Roger D. Adkins and James K. Finley:

### RICKEY MARTIN:

Rickey Martin testified that he worked for New Era from October 1988 until he was laid off on October 18, 1991. Martin ran a shuttle car and he was chairman of the Union's safety committee at New Era. In that position he was to report any safety problems to New Era. Martin accompanied inspectors when they inspected the mine.

In August 1991 there was a roof fall and a federal inspector came to the mine. Martin was not allowed to met the inspector until the inspector came to the mouth of 3 section. Foreman Bill Browning told Martin that he could not meet the inspector outside. While Martin was at the roof fall with the inspector, James Fain and others, Martin asked Fain where were the powder and caps. Fain said, what powder and caps? Martin replied, "the powder and caps that they had up here shooting that rock off of the mine and stuff." As they were walking down out of the section James Fain told Foreman Orville Crumb to take Martin's "ass down to the belt head and finish the shoot. Make him shovel." Martin had been running the shuttle car before that.

When Fain told Crumb to take Martin, Martin responded to James Fain, "I (have) the right to be with that federal man from the time he got at the mines till the time he left." Fain told Martin that he did not have that right. Martin continued to walk with the federal inspector, Fain and the others. As they were walking they came to James Johnson and Martin asked Johnson what he did with the powder and caps he brought in and Johnson replied that he had taken them to 3 section. The federal inspector then asked Johnson if he had taken powder to the section in proper carrying cases and Johnson said no. The inspector told James Fain that if he had powder inside that mine and it's not in the proper casings he had better get it outside or get it in the proper casing right now.

As the party went down to the elevator the inspector told Fain that Martin did have the right to accompany him outside and if he had not, the inspector would have to write New Era a citation. Subsequently, when they came to the office, the inspector told New Era owner Carl Kirk that Martin had the right to be with them.

On another occasion in August 1991, Martin came into a argument between James Fain and Arthur Robinette and Roger Adkins. Martin told Fain, after he entered the conversation, that the belts are supposed to be walked each coal running shift and if the belts were not walked the records would be falsified. Afterward Martin had the Union safety director, Leonard Fleming, meet with New Era owner Carl Kirk over the dispute.

As shown above James Fain was employed by Respondent as superintendent from November 1, 1991.

After Respondent started operations, Rickey Martin phoned James Fain in November 1991. Martin asked Fain why wasn't he going by the seniority pattern in recalling workers. Fain responded that he did not have to go by the seniority system. Fain said, "by the way, I reckon you know that Carl Kirk give you a bad name, don't you." Fain also said, "do you remember that incident we had about the powder and caps. **"

James Fain admitted that on one occasion Rickey Martin told him in front of an inspector that explosives had been brought underground in an improper container. Martin said he had been told that by James Johnson. Fain told Martin that he should not make accusations unless he knew for a fact how the stuff was being transported underground.

Fain denied that he told Orville Crumb to put Martin back to work shoveling the belt.

Martin was contacted by Edith Stanley in March 1992. Martin had a physical examination with Dr. Jamison. Nothing was said about any problems with the physical and no one told Martin that he had failed the physical. However, he was not called to work by Respondent.

Fain testified that he did not know why Rickey Martin was not called to work for Respondent. He testified, "we just didn't call him back. I haven't called him back."

Respondent President Jobie Fields testified that he was the one that rejected Martin for employment. He testified that he considered Martin's physical examination report as well as Martin's past record and absenteeism. According to Fields, he learned of Martin's absenteeism from James Fain.

Fields testified that he rejected other employees for failing the physical examination including Jimmy Cochran, Roger Adkins, Floyd Hensley, James Finley, Paul Maynard, Len Smith, Lloyd Evans and Howard Phillips.

According to Fields if the potential employee "had back problems and high risk injury (the doctor) would put okay to work or I would discuss it with (the doctor) and determine from there and make my decision. And on their past record at the New Era, if it proves to me they've been absent a lot and off on comp, I overlooked them." Respondent President Jobie Fields recalled talking to the doctor on a number of employees including Roger Adkins, Rick Martin and James Finley.

Employee Robert Savage testified that he was called to work with Respondent in February 1992. Savage had worked for New Era. When Savage had his physical examination prior to going to work, the doctor told him that he had a hernia. The doctor would not release Savage to return to work but told Savage that he needed a second opinion. Savage told Edith Stanley at

Respondent, what the doctor had told him and Stanley arranged for him to be examined by a second doctor. On that occasion Savage passed his exam and was permitted to start working.

### ROGER ADKINS:

Roger Adkins testified that he was a coal miner for New Era from August 11, 1988 to October 1991. He was a certified belt examiner. Adkins examined the belts at New Era and he maintained a log which was subject to examination by inspectors.

During August 1991 Superintendent James Fain at New Era sent word by the mine foreman that Adkins and Arthur Robinette had deliberately tore up the rock duster. Adkins went to see Fain and Fain said they had found a paper poke in the duster. Adkins denied doing anything improper to the duster. Fain then said that he was also going to fill out these books. Adkins replied that he would not falsify the books. Fain told him that he would fill out the books. Adkins called for the Union Safety Committeeman, Rickey Martin. When Martin came up Adkins told him that Fain wanted him to fill out the books without walking the belts. Martin agreed with Adkins saying the belts are to be examined each shift. Fain continued to tell Adkins that he would do what he was told. Adkins testified that Fain became pretty violent and jumped up in Adkins' face to the point Adkins thought he was going to hit him.

Adkins told Ricky Martin that he needed to do something because he felt Fain would try to fire him. Martin called Leonard Fleming, the safety coordinator for the UMWA. Fleming came out and met with New Era owner Carl Kirk and Kirk told Fleming that Adkins could walk the belts.

James Fain denied that he ever told Adkins to falsify books.

Adkins filled out a panel form when he was laid off at New Era. In March 1992 Adkins was contacted by Edith Stanley with Respondent and told to take a physical examination on March 5 at the Mate One Clinic. Adkins took the physical examination. The doctor was named Jamison. Jamison said nothing to Adkins about any problems with the physical examination. However, Adkins has not been recalled to work for Respondent.

Adkins testified that he contacted Respondent and talked with someone identified as Charlotte who told him that he would have to contact the Doctor's office regarding the results of his physical examination. He called but the Doctor's office said the results were the property of Respondent since they paid and Adkins would need to contact them. He phoned Charlotte again and after she told him to call back in 15 minutes, she told him that Respondent took the position the results of the physical were their property. Adkins asked if he had failed the physical and Charlotte replied that they were not saying whether Adkins passed or failed the physical. Adkins said that if there is something wrong he would like to go to his doctor and Charlotte said, "I am not saying you failed" and she said she's not saying I passed it. Charlotte told him that he had to understand that she was in the middle.

Superintendent James Fain was asked why Respondent did not employ Roger Adkins. Fain testified that Roger was sent for a physical examination and Respondent was never informed whether Adkins passed the physical or not. Fain testified that Respondent President Jobie Fields was the one that made the decision not to put Adkins back to work.

President Jobie Fields testified that he was the one that rejected Martin for employment and that he rejected other employees for failing the physical examination including Jimmy Cochran, Rickey Martin, Floyd Hensley, James Finley, Paul Maynard, Len Smith, Lloyd Evans and Howard Phillips.

### JAMES K. FINLEY:

James Finley testified that he worked for New Era for over three years until he was laid off on October 18, 1991. Finley ran the machine that dug the coal. Finley was chairman of the mine committee for the Union while he worked at New Era. It was his job to see to it that employee grievances were taken care of; that the grievance was taken to the superintendent. Finley testified that he dealt with the section bosses and met with them at least once a month to consider grievances.

At least three months before his layoff at New Era, Finley met with owner Carl Kirk along with superintendent James Fain and a couple other bosses. Kirk asked Finley for his opinion of working Sundays. Finley responded that the employees should receive

double time if they worked Sunday. That angered Kirk and he stomped around and cursed a little bit, according to Finley. James Fain said that he did not agree with Finley. Additionally, Finley had a disagreement with Edith Stanley shortly before his layoff. Stanley became upset with Finley when he objected to the third shift having to wait until Friday for their paychecks.

Finley completed a panel form when he was laid off by New Era.

After Respondent started operations Finley went to them at least every two weeks and inquired about being recalled. Around March 4, 1992, Edith Stanley phoned Finley to take a physical examination to return to work. Finley was examined at the Mate One ARH clinic by Dr. Jamison. Jamison told him that he did not see any reason why Finley could not return to work. However, no one has contacted Finley about returning to work and no one else has told him the results of his physical.

Fain testified that James K. Finley worked for New Era. When asked why Finley was not called to work for Respondent, Fain testified that Finley failed his physical examination. Fain did not recall what the problem was with Finley's physical.

Fain testified that he was responsible for the hiring at Respondent and he testified that he had panel forms to select the employees from those that worked at New Era. Fain testified that he hired employees for Respondent by using panel forms and going by seniority and the ability to step in and perform the job that was open at the time.

Respondent President Jobie Fields testified that he rejected Finley and other employees for failing the physical examination including Jimmy Cochran, Roger Adkins, Floyd Hensley, Rickey Martin, Paul Maynard, Len Smith, Lloyd Evans and Howard Phillips.

### Findings:

In determining whether the record proved that Respondent failed to hire Martin, Adkins and Finley, because of protected activities, I must first decide whether General Counsel proved a prima facie case. If I so find then I must consider whether Respondent proved that it would have failed to hire Martin, Adkins and Finley in the absence of protected activities. *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982); *N.L.R.B. v. Transportation Management Corp.*, 462 U.S. 393, 113 LRRM 2857 (1983).

The record including my findings above regarding the alleged section 8(a)(5) violations proves union animus.

As shown above I did not credit the testimony of Superintendent James Fain in instances where Fain's testimony was in conflict with credited evidence. As to the testimony of Ricky Martin, Roger Adkins and James Finley, I found Martin, Adkins and Finley all demonstrated good demeanor and recall. I credit their testimony and discredit the testimony of Fain to the extent there are conflicts.

The credited testimony of Martin shows that Respondent's superintendent, James Fain, told Martin when Martin asked about employment with Respondent and why Respondent was not calling former New Era employees in order of seniority, that New Era owner Carl Kirk had given Martin a bad name and did Martin recall the incident with the powder and caps.

The testimony proved that the incident referred to by Fain involved Martin complaining to an inspector about Respondent having powder and caps in the mine. As shown above, Fain became angry during that incident and told the foreman to take Martin's "ass down to the belt head and finish the shoot. Make (Martin) shovel." As the time Martin was fulfilling his role with the Union as chairman of the safety committee.

By associating Respondent's refusal to employ Ricky Martin with an incident that involved Martin's activity on behalf of the Union, Superintendent James Fain illustrated that Martin's protected Union activities was a factor in its decision not to employ Martin. That evidence supports a finding of prima facie proof that Martin's protected union activities was a reason why Martin was not offered employment by Respondent.

In consideration of whether Respondent proved that it would not have employed Martin in the absence of his protected activities, the record contains testimony of Superintendent James Fain in response to a query as to why he did not employ Martin. Fain testified that "we just didn't call him back. I haven't called him back."

The credited evidence discussed above regarding Fain's run-in with Martin while Martin was engaged in safety related activity as Safety Committee Chairman, illustrated that Fain's testimony that he just did not call Martin back, was a pretext. ***Northport Health Services, Inc. v. NLRB,*** 961 F.2d 1547, 140 LRRM 2500 (11th Cir. 1992); ***Control Services***, 305 NLRB 435 (1991).

Fields also alleged that he rejected Martin because of his physical examination report. However, Martin was never told that he had failed the physical examination and in other instances of failure to pass a physical, such as the case of Robert Savage noted above, the employee was told of the problem with the physical and the applicant was given an opportunity to seek a second opinion. However, nothing was said to Martin. He was not told of any problem with his physical and he was not given an opportunity to seek another medical opinion. In view of the above, and my observation of the demeanor of Jobie Fields and James Fain, I do not credit their testimony and find their alleged basis for not hiring Martin, was pretextuous.

In view of the complete record, I find that General Counsel proved that Martin's past Union activity was a reason why he was not employed by Respondent and the evidence proved that Respondent advanced pretextuous reasons for its failure to employ Martin.

Adkins, like Rickey Martin, was involved in a dispute with Superintendent James Fain during August 1991. Adkins insisted on accurately performing his duties of inspecting the belts in the mine. When Fain insisted that Adkins fill out the books without actually walking the belts, UMWA safety coordinator Leonard Fleming was called in to resolve the problem.

As in the case of Ricky Martin, the record shows that Adkins' union activities while he worked under Superintendent James Fain at New Era shortly before New Era ceased operations, caused an angry reaction from Fain.

Moreover, when Adkins tried to determine why he had not been recalled after taking his physical examination, he called Respondent and after being told to call back in 15 minutes, he was told that Respondent would not say whether he passed or failed the physical examination.

In view of the full record I am convinced that Respondent considered Adkins' protected union activities while he worked for New Era, in deciding not to employ Adkins. I find that General Counsel proved, prima facie, that a reason for Respondent's failure to hire Adkins was Adkins' protected union activities.

I find that James Fain, in his testimony that he did not employ Adkins because he never received the results of Adkins' physical examination is not credible. That testimony conflicts with the testimony of Jobie Fields that he rejected Adkins because of Adkins' physical examination. That conflict in their testimony tends to show that Respondent did not actually fail to employ Adkins because of his physical examination. I credit the testimony of Adkins regarding his physical and the report he received after phoning Respondent that Respondent would not say whether he passed or failed his physical. On the basis of that evidence I find that Respondent alleged pretextuous reasons for its failure to employ Roger Adkins. ***Northport Health Services, Inc. v. NLRB,*** 961 F.2d 1547, 140 LRRM 2500 (11th Cir. 1992); ***Control Services***, 305 NLRB 435 (1991).

James Finley, like Martin and Adkins, was active in a position with the Union which caused run-ins with New Era while James Fain was superintendent. Finley was the chairman of the mine committee. Fain, along with New Era owner Kirk, became angry with Finley when Finley told them that employees should receive double time for working on Sundays. Also Finley complained about New Era waiting until Friday for their paychecks.

In view of my findings above, and the full record, I find that General Counsel proved, prima facie, that Finley's position with the Union at New Era, was a consideration in Respondent failing to employ Finley.

I find that the record evidence failed to prove that Respondent would have failed to employ Martin, Adkins or Finley in the absence of their protected Union activities.

As shown above, Respondent President Jobie Fields testified that he rejected Martin, Adkins and Finley because of their physical examinations. The physical examination reports were received in evidence. Several employees had the notation "not qualified" on their physical reports. Neither Martin, Adkins nor Finley had such a notation on their reports.

All three (Martin, Adkins and Finley) received a notation of at increased risk of back injury on their physical examination reports. Other applicants including Danny Carroll, William Gray, Larry Murphy, Johnny Nelson, Ronnie Savage, Jerrill Stacey and James Taylor received similar notations on their physical examination report. Of those employees Danny Carroll was employed by Respondent on December 2, 1991; William Gray was employed on November 21, 1991; Larry Murphy was employed on November 18, 1991; Johnny Nelson was employed on November 21, 1991; Ronnie Savage was employed on November 19, 1991; Jerrill Stacey was employed on November 22, 1991 and James Taylor was employed on November 22, 1991.

All those other employees that received notations of risk of back injury, were employed long before either Martin, Adkins or Finley were sent for physical examinations. Most of those other employees had less seniority than Martin, Adkins and Finley.

Respondent failed to prove why Martin, Adkins and Finley were not employed after receipt of their physical examination reports even though all the other employees with similar notations were employed.

In consideration of the above, the full record including the testimony of Robert Savage (above) that when he failed his physical examination, he was given an opportunity to seek a second medical examination and the evidence showing other employees that received similar physical examination reports to those of Martin, Adkins and Finley, were employed by Respondent, I find that Respondent treated Rickey Martin, Roger Adkins and James Finley in a disparate manner. I find that Respondent failed to prove that it would have refused to employ Martin, Adkins and Finley in the absence of protected Union activities. *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982); *N.L.R.B. v. Transportation Management Corp.*, 462 U.S. 393, 113 LRRM 2857 (1983).

Additionally as shown above under the section regarding alleged section 8(a)(5) violations, the record shows that Respondent made a unilateral change in the method of selecting laid off employees for employment. That change in working conditions directly contributed to Respondent's failure to employee Martin, Adkins and Finley. Ricky Martin ranked number 26 on the seniority list; Roger Adkins ranked number 17 and James Finley ranked number 31. The record shows that Respondent recalled some 22 employees that ranked below Finley and more than 22 employees that ranked below Martin and Adkins. In view of my findings above, it is apparent that Respondent would have recalled Martin, Adkins and Finley if it had followed terms and conditions of employment in effect before it unilaterally changed the method of recalling laid off employees. For that reason, in addition to the reasons stated above, I find that Respondent failed to employ Martin, Adkins and Finley because of its unfair labor practices. *U.S. Marine Corp. v. N.L.R.B.*, 944 F.2d 1305 (7th Cir. 1991); *Great Western Produce, Inc.*, 299 NLRB 1004, 1005 (1990).

**(2) Respondent allegedly transferred and, on two occasions, discharged Arthur Robinette:**

Arthur Robinette started working as a coal miner for New Era on October 3, 1988. He was employed by Respondent on December 10, 1991. Robinette testified that he is president of Local 2453 and he had served as financial secretary.

After being employed by Respondent, Robinette was off for a period of time while he worked on collective bargaining contract negotiations for the Union with Respondent. He testified that he went back to work for Respondent on February 7, 1992.

Employee Robert Savage was told that he had dirty urine during a drug test and he was sent home. As he left he told Arthur Robinette what had occurred. Robinette said that was reason to strike and he needed to talk to the men.

Robinette talked to Respondent's unit employees about Respondent having sent employee Robert Savage home because Savage had not passed his drug test. Robinette told the employees that he did not think it was right for Respondent to send Savage home

because there were two others working that had not passed their drug tests. A one day work stoppage was called. Robinette admitted that he did not talk with Respondent.

Savage returned on the Saturday following his drug test and met with James Fain and President Jobie Fields. Fain asked if Savage had called the inspectors on square knotting cables. Savage told Fain and Fields that he did not call the inspectors. Fain asked Savage if he caused the strike. Savage denied that he caused the strike and Fain asked who had. Savage said he would not name names. Fain said that he pretty well knew it was Arthur Robinette.

James Fain recalled that the evening shift refused to work one night after Robert Savage had been sent home because of a problem with his medical report. Fain admitted that he may have asked Savage whether or not Robinette caused the strike.

Robinette also served as chairman of the safety committee because the safety committee chairman at New Era, Ricky Martin, had not been employed by Respondent. In March 1992, in his capacity as safety committee chairperson, Robinette accompanied MSHA inspector Paul Fuller. Garfield Potter told Robinette to get on the man-bus with the inspector along with Superintendent James Fain and a chief electrician. The inspector, Paul Fuller, introduced himself to Robinette and Robinette told him that he was president and chairman of the Safety Committee of Local 2453. Robinette testified that at one point Superintendent James Fain told the inspector that it was a short distance to the end of the trolley line and Robinette disagreed, saying he thought the line went farther. Subsequently, the man-bus went off the line and Fain instructed Robinette to put the man-bus back on the track and Fain and the inspector walked on out. On the next shift he worked, Robinette was removed from his job as supply motor operator and assigned to David Webb's section to operate a shuttle car. Shuttle cars are used to haul coal from the miner to the feeder. Robinette testified that supply motor operator was a better job than shuttle car operator because it was out in clean air with less dust. Robinette was never told why he had been transferred from the supply motor to the shuttle car.

On another occasion, Robinette observed what he considered unsafe conditions. He talked with another employee, John Baisden, and told Baisden that he was going to try and have the unsafe conditions corrected. Robinette asked employee Haskell Runyon to get David Webb. Robinette told Webb that he was president of the local and chairman of the safety committee and there were unsafe conditions including the curtain being on the ground and the working area was not being ventilated; there was no rock dust for at least 100 feet back from the working face and that the roof bolt operators should be issued methane protection because Webb had not been checking for methane every 20 minutes. Robinette also said the glob needed cleaning. Robinette told Webb that he was requesting a federal or state inspector that night to look at those unsafe conditions. Webb told Robinette that he would have to make a call and Webb left the area.

When Webb returned he told Robinette to go ahead and work on correcting the conditions. Webb told Robinette to get a tool from the electrician and break down the water hose and wet down the area. Haskell Runyon and Robinette were in the process of doing that when Garfield Potter came up and Robinette explained to him that he was chairman of the safety committee and he explained to Potter the conditions he had pointed out to Webb and that he was requesting a federal or state inspector. Potter told Robinette to go with him to look at the roadways. Robinette asked if Runyon could accompany them and Potter said that he could. After walking about 50 feet Potter said there is nothing wrong with these roadways. Potter told Robinette, "You come with me."

Robinette asked Potter if he should bring his dinner bucket. Potter told him that he should bring his dinner bucket. At the switch on the man-bus Potter switched to the outside line and Robinette asked if he was taking him outside and if Potter was firing him. Potter told Robinette that he was firing him for refusing to work.

Robinette was asked on cross examination, if he refused to run the shuttle that night. He replied that Garfield Potter asked him that same question and he replied to Potter that he was willing to correct the unsafe conditions or to work in another area.

David Webb testified that he formerly worked for Respondent as a section foreman. Webb recalled that Robinette complained to him about safety on March 20, 1992. Robinette told him that the roadways needed to be watered down and the ventilation was not up to par and the men needed methane spotters. Webb told Robinette that it was the car driver's job to hang the wind curtains. At that time Robinette was the car driver. As to methane spotters, Webb told Robinette that was Webb's job, Webb had checked

the air and found they had over twice what was needed. With Robinette, Webb checked the roadway and Webb determined they were all right. Webb told Robinette that he would report the matter to his supervisor. Webb phoned Garfield Potter.

Garfield Potter testified that he is a section foreman but he was formerly mine foreman at both Respondent and New Era. He was second shift mine foreman in March 1992. Potter testified that Foreman Webb phoned him and told him that Arthur Robinette had shut down his section and that Robinette had listed two or three things. Potter went to the mine. He asked Robinette what was his problem and Robinette said he needed more air, he wanted methane spotters and the wanted the roadways watered down. Potter asked Webb about the amount or air and Webb told him they had 18,000 and the law required only 9,000. Potter testified that they were not required to give methane spotters to the bolt machine men. Potter asked Robinette to show him where the roadway problem was and, after viewing that area, Potter said there was no problem. They talked some more and Robinette told Potter that he was not going to be jacked around. Potter asked him who was jacking him around and Robinette did not answer. Potter asked Robinette to go back to work and Robinette said he would not work under the circumstances. Robinette refused Potter's request to return to work on several occasions and Robinette asked for a federal or state inspector. Potter told him it was Friday night and they could not get an inspector that night. Potter took Robinette outside. As they were leaving Robinette asked Potter if he was firing him. Potter replied "you've quit, you refuse to work, you quit. I'm taking you outside."

Superintendent Fain testified that he did not make the decision to discharge Robinette but he did approve that decision. Fain was told that Robinette was operating the shuttle car which required some repairs by an electrician. Within two or three minutes after the repair was complete and the car returned to Robinette, Robinette had the section shut down. Robinette said that they did not have enough air in the working face; the roof bolt operators were not issued methane spotters and the roadways were dirty. Fain testified that no inspectors came to the mine that night but the next week, on Tuesday, five or six inspectors showed up because there was a complaint filed with MSHA. Fain recalled they were not shut down and they may have gotten one or two violations but that had nothing to do with the issues raised by Robinette.

Electrician Charles Thacker recalled that evening when Potter escorted Robinette out of the mine. Thacker testified that the air had been short circuited that night. They were tearing out brattices while moving sections around and taking air from where they were moving and trying to redirect air back to the main section.

Haskell Runyon testified about Robinette calling attention to safety problems in March 1992. Robinette told him that he felt there were dangerous conditions in the mine and that he wanted to talk to the foreman of that section to get the things taken care of. Robinette talked to David Webb. Runyon testified the mine curtains for ventilation were not up; the section hadn't been scooped or cleaned, loose coal was laying around and the roadways were pretty dusty. Runyon recalled that visibility was bad and you could hardly see the miner.

Runyon went to David Webb and had Webb come to the section. When Webb came over Robinette explained the conditions and asked Webb for a state or federal inspector. Runyon thought Robinette asked that the pin men should have spotters to test for methane. Pin man and roof bolter is the same. Webb went to call his boss. When Webb returned he told them to get the equipment back off the face and go ahead and start dusting and cleaning the section.

Runyon recalled they were nearing completion of the dusting and cleaning when Garfield Potter came up. Potter asked Robinette if he would work somewhere else where he thought it was safe and Robinette said he would. Potter told him to get his dinner bucket and go with him. Potter and Robinette left the area.

Venita Branham, Local recording secretary, testified that she was with Section Foreman David Webb on a night in late March 1992, when Haskell Runyon came and told them there was a problem in the mine. Branham followed Runyon because she was a trained emergency medical technician. Arthur Robinette told David Webb that he was local union president and the safety committee person and he wanted an inspector, state or federal. Branham testified there was no ventilation curtain, there was fog at least 80 feet back in that section of the mine and Robinette complained that he could not see to run the shuttle. Webb replied to Robinette that he should hang the curtain. Robinette told him that he couldn't hang curtain and shovel belt too. Branham testified there was coal gob at least 80 feet from the face and Robinette complained about that and about a lack of rock dust.

Webb left and subsequently came back and told Branham to go on her scoop and start cleaning. Branham started rock dusting and hanging curtain. Later Webb came to her and told her to go run the shuttle car. Running the shuttle car had been Robinette's job. Webb told Branham they had taken Robinette to a safe place to work. Branham admitted that was the night Robinette was taken out of the mine and suspended from work.

Branham explained that the curtain was used to ventilate the mine with fresh air. The mine had problems with methane which was explosive. In addition to the curtain, it was necessary to dust the mine with rock dust. Rock dust held down coal dust which contributed to an explosion problem. The state law, according to Branham, required 65% rock dust within 20 feet of the face of the mine. The scoop operator scoops up the coal gob that falls from the buggies. Coal gob may contribute to the amount of coal dust near the face. Branham recalled that it was so dusty on that particular night that when she was running the shuttle she could not see the end of the boom.

Robinette talked with the Union District field representative, Vernon Atkins. Atkins told him that at that point Respondent was not recognizing grievances and suggested that Robinette go to MSHA. Robinette filed charges with MSHA.

Robinette met with Respondent representatives James Fain, Joe Gaither and David Webb. Field Representative Vernon Atkins and Venita Branham accompanied Robinette. Robinette said they were there to file a grievance. Joe Gaither replied that at that point Respondent was not going to say they would go by the grievance procedure but they would not say they were not going by the grievance procedure either. Subsequently Robinette received a letter from James Fain dated April 8, 1992 offering reinstatement.

On April 10, 1992 the Union attorney wrote Respondent's attorney:

**We are delighted your client Mate Creek Development, Inc., has rehired Arthur Robinette, who was wrongfully discharged three weeks ago. He has still not been made whole, however, since he is owed three weeks lost wages. Please instruct your client to make Mr. Robinette whole, so as to avoid costly legal action, should we need to resort to it to achieve a remedy.**

Robinette reported back to work. He was placed in general labor work, - odd jobs. Subsequently, Robinette gave Respondent a letter saying he was taking off one day to take care of Union business. When Robinette next returned to work he was taken on the man-bus and told to shovel a distance on the belt lines. Robinette testified that shoveling is the most physical demanding job in the mine. He was having to shovel water and mud.

Fain recalled Robinette to work. Fain admitted that Robinette was recalled and told that he would be on the general labor force. General laborers do about anything in the mine.

Charles Dixon wrote Respondent on Union letterhead paper and asked that Arthur Robinette be excused on April 20, 1992 to attend to official Union business.

Following Robinette's reinstatement, he was discharged again. On that occasion, on his last night of work, Robinette told his supervisor that he was only working 8 hours. After eight hours Robinette started out of the mine. He met Bill Church and his supervisor, Roy Gibson. Church asked him, "You know we have a 9 hour shift here. Would you care to go back and work another hour?" Robinette replied, "According to the contract, in my opinion, eight hours was all I had to work." Church gave him a ride on down to the elevator and Roy Gibson told Robinette that he would write something up.

Superintendent Fain testified that Robinette was suspended when he refused to work over eight hours on his shift during April 1992. Fain testified that Respondent had worked nine hour shifts since starting operations at the mine and, up until that evening, Robinette had worked the nine hour shifts.

Billy Church, the outby foreman, testified that Robinette did refuse to work the full nine hour shift and was discharged. Church knew that Robinette was the Local president. Church, like Robinette, had previously worked for New Era. Church agreed that the standard work day at New Era was eight hours.

**Findings:**

As shown above, I was not convinced that James Fain testified truthfully. I found Arthur Robinette to be a candid witness. I was impressed with his demeanor. In many instance Robinette's testimony was not rebutted. I credit the testimony of Robinette.

Robinette's credited testimony shows that in March 1992, on the shift following a dispute Robinette had with Superintendent Fain while Robinette was serving in his capacity as safety committee chairperson and accompanying an inspector in the mine, Robinette was reassigned from his job as supply motor operator to shuttle car operator. The evidence illustrates that Robinette's actions while acting as safety committee chairperson the day before his reassignment, contributed to his being reassigned. I find that General Counsel proved a prima facie case in that regard.

Respondent never told Robinette why he was reassigned to the job of shuttle car operator and there was no showing at the hearing why Respondent took that action against Robinette. In view of the full record, I find that Respondent failed to prove that it would have reassigned Robinette to the job of shuttle car operator in the absence of his protected Union activities.

I also credit the testimony of Robinette regarding his complaint about safety conditions in the mine during March 1992. I credit the testimony of employees Charles Thacker, Haskell Runyon and Venita Branham. I was impressed with their demeanor. I credit those employees testimony regarding the safety of the mine on the night Robinette was discharged. I do not credit testimony from Respondent's witnesses to the effect that there was no evidence of unsafe conditions. The credited testimony shows that Arthur Robinette was suspended then discharged, because he complained about safety conditions in the mine in his role as Local president and safety committee chairperson. The conditions in the mine did involve what the employees felt were unsafe conditions.

The credited testimony shows that Robinette did refuse to work under what he and other employees considered to be unsafe conditions unless those conditions were improved. Robinette offered to work elsewhere or to help restore conditions to a safe level. I do not credit the testimony of Garfield Potter that Robinette quit work by refusing to work.

I find that General Counsel proved a prima facie case as to that discharge. The record proved that Robinette's action as Union president and safety committee chairperson, contributed to Respondent's decision to discharge him.

The record illustrated that Robinette explained that he was acting as Local president and chairman of the safety committee. Respondent elected to discharge Robinette. I find that action constitutes a violation of section 8(a)(1) and (3) of the Act and Respondent failed to show that it had any other bases for discharging Robinette. I find that Respondent failed to prove that Robinette would have been discharged in the absence of his protected activities. *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982); *N.L.R.B. v. Transportation Management Corp.*, 462 U.S. 393, 113 LRRM 2857 (1983).

Finally, Robinette was again discharged after being reinstated to a more difficult job on the general labor force. As to that reinstatement I find that Respondent failed to reinstate Robinette to the same or, in the absence of his position of supply motor operator, to a substantially equivalent position, and, that Respondent's first discharge of Robinette was not remedied. My recommended order shall include requiring Robinette's reinstatement to his job of supply motor operator.

After being reinstated Robinette was discharged when he refused to work a nine hour shift. In view of my finding above, that Respondent engaged in unilateral changes in violation of section 8(a)(5) by, among other things, changing hours of work from eight to nine hours a day, I find that Respondent engaged in conduct in further violation of the Act by discharging Robinette because of its unlawfully implemented change to a nine hour work shift.

The applicable test regarding cases of this type is simply if "the Respondent's unlawfully imposed rules or policies were a factor in the discipline or discharge, then the discipline or discharge violates Section 8(a)(5)". *Great Western Produce*, 299 NLRB 1004 (1990).

MATE CREEK DEVELOPMENT INC. AND UNITED..., 1993 WL 1609491...

Here there is no factual dispute. New Era worked eight hour shifts. The policy was changed by Respondent. Respondent instituted a nine hour work day at a time when it was a successor employer to New Era; Respondent made that change without bargaining to agreement or impasse with the Union and Respondent discharged Robinette because he refused to work the nine hour shift. Robinette informed Respondent that he felt the nine hour rule was unlawfully imposed and refused to work beyond eight hours even though he had worked full nine hour shifts before the day of his discharge.

I find that Arthur Robinette was discharged because he refused to work beyond an eight hour shift; Respondent had unlawfully imposed the nine hour shift and it was a factor (the only factor), in Robinette's discharge; and Respondent violated Section 8(a) (1) and (5) by its discharge of Arthur Robinette. ***Great Western***, supra.

## CONCLUSIONS OF LAW

1. Respondent was a successor employer to New Era and obligated to recognize and bargain with United Mineworkers of America, its District 17 and with its Local 2453, as exclusive collective bargaining representative of Respondent's employees in the below described collective bargaining unit:

**All employees of (Respondent) engaged in the production of coal, including removal of overburden and coal waste, preparation, processing cleaning of coal and transportation of coal (except by waterway or rail not owned by (Respondent), repair and maintenance work normally performed at the mine site or at a central shop of (Respondent) and maintenance of gob piles and mine roads, and work of the type customarily related to all of the above at the coal lands, coal producing and coal preparation facilities owned or operated by (Respondent) excluding all coal inspectors, weigh bosses at mines where men are paid by the ton, watchmen, clerks, engineering and technical employees and all professional employees, guards and supervisors as defined in the Act.**

2. Respondent violated Section 8(a)(5 and (1) of the Act when it instituted policy changes without first notifying and bargaining with the Union by changing its unit employees regular work day from eight to nine hours; by changing its selection of unit employees for hire from one of working with the Union through employee Venita Branham and from one of considering each employee for hire on the basis of seniority and ability to perform the available work; by using contract employees to perform bargaining unit job functions; by changing its absentee policy; by reducing the number of holidays for unit employees; by lowering the hourly pay for unit employees; by changing the vacation entitlement for unit employees and by failing to pay pension benefits for unit employees.

3. Respondent violated Section 8(a)(5) and (1) of the Act by discharging its employee Arthur Robinette because Robinette refused to work nine hours under Respondent's unlawful nine hour work day.

4. Respondent violated Section 8(a)(3) and (1) of the Act by refusing to employ Rickey Martin, Roger Adkins and James Finley and by reassigning to other positions and discharging its employee Arthur Robinette.

## THE REMEDY

Having found that Respondent has engaged in unfair labor practices, I shall recommend that it be ordered to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act.

Having found that Respondent violated Section 8(a)(5) and (1) of the Act by unilaterally changing terms and conditions of employment for bargaining unit employees, I shall order Respondent to offer immediate and full reinstatement to Arthur Robinette and any other employee who was discharged pursuant to the illegally instituted rules and procedures. I shall order the Respondent to make whole Arthur Robinette and any other employee who has been discharged or otherwise lost earnings pursuant to such rules and procedures as prescribed in **F.W. Woolworth Co.**, 90 NLRB 289 (1950), with interest as described in ***New Horizons for the Retarded,*** 283 NLRB 1173 (1987).

Having found that Respondent violated Section 8(a)(3) and (1) of the Act by illegally reassigning to other jobs and discharging its employee Arthur Robinette and refusing to employ Rickey Martin, Roger Adkins and James Finley, I shall order Respondent to offer Robinette, Martin, Adkins and Finley immediate reinstatement to their former positions which, in the case of Robinette,

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

he occupied before being illegally reassigned from the position of supply motor operator, and in the case of Martin, Adkins and Finley, to positions they formerly occupied while working for Respondent's predecessor, New Era, or if those jobs no longer exist, to substantially equivalent employment without prejudice to their seniority or other rights and privileges. I further order Respondent to make Robinette, Martin, Adkins and Finley whole with interest, for any loss of earnings they suffered as a result of the discrimination against them and that Respondent remove from its records any reference to the unlawful actions against Robinette, Martin, Adkins and Finley and notify each of them in writing that Respondent's unlawful conduct will not be used as a basis for further personnel action. Backpay shall be computed as described in **F.W. Woolworth Co.**, 90 NLRB 289 (1950), with interest as described in **New Horizons for the Retarded**, 283 NLRB 1173 (1987).

Having found that Respondent has violated Section 8(a)(5) and (1) of the Act by illegally making unilateral changes in terms and conditions of employment without first offering to bargain with the Union as representative of the employees in the below described collective bargaining unit, I shall order that upon request by the Union, Respondent must restore terms and conditions as they existed before Respondent's illegal action, and recognize and bargain with the Union before making changes to working terms and conditions in the below described collective bargaining unit:

**All employees of (Respondent) engaged in the production of coal, including removal of overburden and coal waste, preparation, processing cleaning of coal and transportation of coal (except by waterway or rail not owned by (Respondent), repair and maintenance work normally performed at the mine site or at a central shop of (Respondent) and maintenance of gob piles and mine roads, and work of the type customarily related to all of the above at the coal lands, coal producing and coal preparation facilities owned or operated by (Respondent) excluding all coal inspectors, weigh bosses at mines where men are paid by the ton, watchmen, clerks, engineering and technical employees and all professional employees, guards and supervisors as defined in the Act.**

### ORDER [1]

Pursuant to Section 10(c) of the National Labor Relations Act, as amended, it is hereby ordered that Respondent, Mate Creek Development, Inc., its officers, agents, successors and assigns shall:

1. Cease and desist from:

(a) Refusing to meet and bargain with United Mineworkers of America, District 17 and Local Local 2453, as the exclusive collective bargaining representative of its employees in the below described bargaining unit, before making changes in terms and conditions of employment:

**All employees of (Respondent) engaged in the production of coal, including removal of overburden and coal waste, preparation, processing cleaning of coal and transportation of coal (except by waterway or rail not owned by (Respondent), repair and maintenance work normally performed at the mine site or at a central shop of (Respondent) and maintenance of gob piles and mine roads, and work of the type customarily related to all of the above at the coal lands, coal producing and coal preparation facilities owned or operated by (Respondent) excluding all coal inspectors, weigh bosses at mines where men are paid by the ton, watchmen, clerks, engineering and technical employees and all professional employees, guards and supervisors as defined in the Act.**

(b) Reassigning to other jobs, discharging and refusing to reinstate its employees, because of its employees union activities and because of its imposition of illegal rules and practices.

(c) In any like or related manner interfering with, restraining, or coercing its employees in the exercise of rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act:

(a) On request of the Union, rescind changes in terms and conditions of employment which it made at any time at its mine at Sidney, Kentucky, and retroactively restore preexisting terms and conditions of employment, including wages, hours, benefit plans and other terms and conditions as they existed before Respondent assumed the Sidney operations until it negotiates in

good faith with the Union or until impasse. The reimbursement of wages shall be computed as in *Ogle Protection Service*, 182 NLRB 682 (1970), enfd. 444 F.2d 502 (6th Cir. 1971), plus interest as prescribed in *New Horizons for the Retarded*, 283 NLRB 1173 (1987). The Respondent shall remit all payments it owes to employee benefit funds and reimburse its employees in the manner set forth in *Kraft Plumbing & Heating*, 252 891 fn. 2 (1980), enfd. 661 F.2d 940 (9th Cir. 1981), for any expenses resulting from the Respondent's failure to make these payments. Any amounts that the Respondent must pay in to the benefit funds shall be determined in the manner set forth in *Merryweather Optical Co.*, 240 NLRB 1213 (1979).

(b) Upon request, recognize and bargain with United Mineworkers of America, Local as the exclusive collective bargaining agent of the employees in the below described unit:

**All employees of (Respondent) engaged in the production of coal, including removal of overburden and coal waste, preparation, processing cleaning of coal and transportation of coal (except by waterway or rail not owned by (Respondent), repair and maintenance work normally performed at the mine site or at a central shop of (Respondent) and maintenance of gob piles and mine roads, and work of the type customarily related to all of the above at the coal lands, coal producing and coal preparation facilities owned or operated by (Respondent) excluding all coal inspectors, weigh bosses at mines where men are paid by the ton, watchmen, clerks, engineering and technical employees and all professional employees, guards and supervisors as defined in the Act.**

(c) Offer Arthur Robinette, Rickey Martin, Roger Adkins and James Finley immediate and full reinstatement to their former jobs, or if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed, and make Robinette, Martin, Adkins and Finley whole for any loss of earnings plus interest they suffered by reason of its illegal action.

(d) Post at its facility in Sidney, Kentucky, copies of the attached notice. [2] Copies of the notice, on forms provided by the Regional Director for Region 9, after being signed by the Respondent's authorized representative, shall be posted by the Respondent immediately upon receipt and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material.

(e) Post at its Sidney, Kentucky mine copies of the attached notice marked "Appendix." Copies of the notice, on forms provided by the Regional Director for Region 9, after being signed by the Respondent's authorized representative, shall be posted by the Respondent immediately upon receipt and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced or covered by any other material.

(f) Notify the Regional Director, for Region 9, in writing within 20 days from the date of this Order what steps the Respondent has taken to comply.

Dated at Washington, D.C. October 22, 1993

J. Pargen Robertson
Administrative Law Judge

"APPENDIX"

NOTICE TO EMPLOYEES

Posted by Order of the National Labor Relations Board

An Agency of the United States Government

**The National Labor Relations Board has found that we violated the National Labor Relations Act and has ordered us to post and abide by this notice.**

**Section 7 of the Act gives employees these rights.**

**To organize**

**To form, join or assist any union**

**To bargain collectively through representatives of their own choice**

**To act together for other mutual aid and protection**

**To chose not to engage in any of these protected concerted activities.**

**WE WILL NOT** discharge, reassign to other jobs, or refuse to hire our employees because of their union activities or because of our enforcement of rules and practices implemented without first bargaining with the Union in good faith.

**WE WILL** offer immediate and full reinstatement to Arthur Robinette, Rickey Martin, Roger Adkins and James Finley.

**WE WILL** make Arthur Robinette, Rickey Martin, Roger Adkins and James Finley whole for any loss of earnings they suffered by reason of our discrimination against them with interest.

**WE WILL** rescind our discharges and refusals to rehire Robinette, Martin, Adkins and Finley.

**WE WILL NOT** refuse to recognize and bargain with **UNITED MINEWORKERS OF AMERICA, DISTRICT 17, LOCAL 2453** as exclusive collective bargaining agent of our employees in the below described collective bargaining unit before making changes in terms and conditions of employment

**All employees of (Respondent) engaged in the production of coal, including removal of overburden and coal waste, preparation, processing cleaning of coal and transportation of coal (except by waterway or rail not owned by (Respondent), repair and maintenance work normally performed at the mine site or at a central shop of (Respondent) and maintenance of gob piles and mine roads, and work of the type customarily related to all of the above at the coal lands, coal producing and coal preparation facilities owned or operated by (Respondent) excluding all coal inspectors, weigh bosses at mines where men are paid by the ton, watchmen, clerks, engineering and technical employees and all professional employees, guards and supervisors as defined in the Act.**

**WE WILL**, upon request by the Union, rescind all changes in terms and conditions of employment which we unilaterally imposed on our bargaining unit employees and we will recognize and bargain with the Union as the exclusive collective bargaining agent of our employees in the above described unit before making changes in terms and conditions of employment.

**WE WILL NOT** in any like or related manner, interfere with, restrain or coerce our employees in the exercise of their rights guaranteed them by section 7 of the National Labor Relations Act, as amended.

**MATE CREEK DEVELOPMENT, INC.**

**(Employer)**

**Dated _____ By _**

**(Representative)**

**(Title)**

**This is an official notice and must not be defaced by anyone.**

**This notice must remain posted for 60 consecutive days from the date of posting and must not be altered, defaced, or covered with any other material. Any questions concerning this notice or compliance with its provisions may be directed to the Board's Office, 550 Main Street, Room 3003, Cincinnati, Oh. 45202-3271, Telephone 513-684-3663.**

1   If no exceptions are filed as provided by Section 102.46 of the Board's Rules and Regulations, the findings, conclusions and recommended Order shall, as provided in Section 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

2   If this Order is enforced by a Judgment of a United States Court of Appeals, the words in the notice reading "POSTED BY ORDER OF THE NATIONAL LABOR RELATIONS BOARD" shall read "POSTED PURSUANT TO A JUDGMENT OF THE UNITED STATES COURT OF APPEALS ENFORCING AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD."

**End of Document**                                   © 2011 Thomson Reuters. No claim to original U.S. Government Works.

Westlaw Next © 2011 Thomson Reuters. No claim to original U.S. Government Works.                23